[No. B125364. Second Dist., Div. Seven. May 9, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
KASEEN JACKSON et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts V. through XVII.

Counsel

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant Kaseen Jackson.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Jant Price.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**JOHNSON, Acting P. J.**—A jury convicted defendants Kaseen Jackson and Jant Price of one count of murder and two counts of attempted murder. It also convicted Jackson on a third count of attempted murder not involving Price. In the published portions of this opinion we hold the *Leon* "good faith" exception[1] does not apply to a motion to suppress unlawfully obtained wiretap evidence; the wiretap evidence in this case was unlawfully obtained because the wiretap orders failed to identify any of the persons who were targets of the wiretaps; and the prosecution must disclose all statements of the defendant intercepted by a wiretap. We also find, however, these errors were not prejudicial under the facts of this case. In the unpublished portions of this opinion we discuss the appellants' remaining contentions and conclude the judgments should be affirmed after minor modifications in the sentences.

FACTS AND PROCEEDINGS BELOW

Bearing in mind the numerous evidentiary issues raised by defendants, we nevertheless state the facts in the manner most favorable to the judgment in accord with the usual rules on appeal.[2]

 A. *Murder of Hendrix; Attempted Murders of Smith and Andrews.*

 1. *A Day of Peace Turns into a Night of Violence.*

In an attempt to arrange a peace between three warring gangs, the 4-Deuces and 4-Treys on one side and the 5-Trey Avalons on the other, a

---

[1] *United States v. Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405].

[2] *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].

former 4-Trey member hosted an afternoon barbeque at his home and invited members of all three gangs. Defendant Price, a 4-Trey, attended, as did members of the other gangs. Price and one of the Avalons got into a verbal altercation but no blood was spilled.

Later in the evening five 4-Deuces met on a street corner in their territory. As they stood talking and gambling two men dressed in black walked up and started shooting. The men killed one of the 4-Deuces, Baby Deuce, and wounded two others.

Defendant Jackson, a 4-Trey, arrived soon after the shooting. Dee Ragland, who lived across the street from the murder scene, stated Jackson appeared very upset about the murder and had tears in his eyes. Ragland told police Jackson, who often stayed at her home, left the scene after the ambulance took Baby Deuce away and she did not see him again until around midnight, approximately five hours later. Ragland's son corroborated his mother's statement and added he did not see Jackson again the rest of the night or the next morning.

Following the murder of Baby Deuce, 20 to 30 members of the 4-Treys and 4-Deuces gathered to discuss what should be done about Baby Deuce's murder. A witness to the meeting told police the crowd had a "lynch mob mentality." Some in the crowd believed the Avalons were responsible for the shooting while others accused another gang, the Bloods. After this meeting broke up Price and Jackson went looking for revenge against the Avalons.

Four members of the Avalon gang, Smith, Andrews, Harris and Hendrix (the latter known as "Lunatic"), were standing around Hendrix's car when a dark brown car with a missing headlight came slowly toward them. The car sped up and six shots were fired from the backseat on the driver's side. The four Avalons began running in different directions. Smith was hit in the ankle by one of the first shots and fell. As he lay on the ground Smith heard a car door open and saw a person get out. The person began firing at Andrews and Hendrix, who were running down an alley. Hendrix fell. The shooter walked up to him and fired additional shots into his body as he lay facedown on the ground. The shooter then returned to the car, which drove off. Hendrix died from his wounds.

Several witnesses stated there were three persons in the car from which the shots were fired but none could identify Price or Jackson. One witness, however, positively identified Price's car as the car with one headlight he had seen approaching the area just before the shooting started.

Three days later police stopped Price on an unrelated matter. The officers noticed a bullet hole in the rear passenger door on the driver's side, which had

been made by a bullet fired from within the car. They also observed the rear window was broken and glass fragments were lying on the backseat. One of the car's headlights did not work. Price admitted he had attended the peace barbeque earlier in the week. He told the officers he remained there until around midnight. He also stated he had not loaned his car to anyone that night and the bullet hole resulted from someone shooting at him weeks earlier.

### 2. *Jackson and Price Admit the Murder and Attempted Murders.*

Jackson and Price admitted their involvement in the murder and attempted murders to several persons.

The jury heard a taped interview with Tywaun Cannon, who had been in the group of 4-Deuces when Baby Deuce was shot and killed. Cannon stated Jackson came up to him at Baby Deuce's funeral complaining members of the 4-Treys were angry at him for killing Hendrix. Jackson thought this was unfair. He told Cannon: "Man, the homie get killed. I go over there 20 minutes later and smokin' a nigger and theys acting like they mad at me." Repeating his complaint, Jackson stated: "I'll [*sic*] go over there and kill this nigger, Lunatic, 20 minutes later . . . and now they act like they mad at me." When called as a prosecution witness Cannon admitted he made these statements to the police but claimed they were lies. According to Cannon's trial testimony the police had threatened to prosecute him for the Hendrix murder unless he implicated Jackson.

Curtis Davis, a member of the 4-Hoover gang, told police Jackson had talked to him about the shootings. Jackson told Davis "I killed the nigger" and "I got one of them, one got away. I don't know how he got away." At trial Davis denied knowing Jackson, knowing anything about this case, having any conversations with the police about the case or making any of the statements attributed to him.

George Lewis (Little Scrappy), a member of the 4-Deuces, told police in a taped interview Price admitted to him two days after the shooting he had been the one driving the car. Price said: "[T]he Avons have got smoked, you know."[3] When Lewis responded, "Really?" Price said "Yeah, . . . I took the homies over . . . to go serve them."[4] At trial Lewis denied making any of the statements on the tape.

Another witness, George Wheeler, overheard a conversation the day after the shooting in which one 4-Trey told another he should not have shot when

---

[3] "Avons" was a pejorative term the 4-Deuces and 4-Treys used for the Avalons.

[4] Lewis told the police "go serve" means to kill.

he did because he shot Price's car. Price then said, "Yeah, you damn near shot me in the back of the head, cuz." In his trial testimony Wheeler claimed he could not recall telling the police about this conversation.

### B. *Attempted Murder of Marquis Grays.*

Three weeks after the Hendrix murder another Avalon gang member, Carl Caldwell, was shot to death during a confrontation between Avalons and 4-Treys. Marquis Grays, an Avalon gang member who was a potential witness to the Caldwell murder, was shot and wounded a few days later as he sat in a car in front of his mother's house.

Grays told police just before the Caldwell shooting a Ford Taurus pulled up along side the car he was riding in and a passenger in the Taurus yelled out "4-Trey, motherfucker." The cars then went in different directions. Grays parked in front of his mother's house and he and the driver sat in the car drinking. Grays heard gunshots. Someone said Caldwell had been shot around the corner. Grays went to the scene and found Caldwell lying in the street.

Three days later, as Grays again sat in a car parked in front of his mother's house, two cars pulled up and someone inside one of the cars started shooting at him. A bullet wounded Grays in the leg but he managed to drive away.

Grays identified Jackson from a photographic lineup as the person who had yelled "4-Trey motherfucker" on the night Caldwell was killed and who had shot at him three days later.

Grays recanted his statements to the police when called as a witness. He testified he had lied to the detectives because he was angry and frustrated over his friend Caldwell's death and he wanted someone to pay. He also stated the reason why he had identified Jackson as the shooter was because the police had manipulated the photographic lineup.

Frankie Andrews testified at Jackson's trial and at the trial of the 4-Trey member accused and convicted of killing Caldwell. At the trial in the present case Andrews stated she was at home when she heard an argument out on the street. Looking outside she saw men in a Ford Taurus arguing with Caldwell and another Avalon member who were in a Chevrolet Caprice. One of the men in the Taurus began shooting at the Caprice. From a photographic lineup Andrews identified Jackson as one of the men in the Taurus but said he was not the shooter. Andrews was unable or unwilling to confirm her identification of Jackson at trial. Andrews also testified that after she went to the police with her information on the Caldwell case she received threats, and the police helped her relocate. She denied her move was the result of intimidation from

4-Trey members. She admitted, however, that during a break in the Jackson trial she told one of the detectives she was afraid of the 4-Trey members sitting in the hallway "looking at her." She also stated 4-Trey members were "picking on my daughter."

### C. A Wiretap Picks up Statements by Jackson Referring to Prosecution Witnesses.

The trial court admitted transcripts of 14 telephone calls Jackson placed from jail while awaiting trial in this case. The police intercepted and recorded these calls in the course of a wiretap which had been authorized in an unrelated case. We explain the factual and procedural background of these wiretaps in part I of our discussion, *post.*

In the recorded conversations Jackson makes statements which could be interpreted as urging friends and associates to provide him with perjured alibis and to intimidate potential witnesses against him, including Lewis, Cannon, Frankie Andrews and Grays, who in fact did repudiate their statements to the police when called as witnesses for the prosecution.

One conversation about Lewis went as follows:

"[Jackson]: Scrappy told the police that I told him that I did it and all this, so the police are looking for me. They got me. . . . [A]nd now [Scrappy] is my key witness, and based on being my key witness they are going to subpoena him to come to court. . . .

"[Female]: You gonna get that ass, huh?

"[Jackson]: No. I ain't going to fuck with him. I ain't even tripping like that.

"[Female]: You ain't tripping like that?

"[Jackson]: No. Because that's going to fuck me up. . . . The only thing I'm trying to do is I'm just trying to highlight the nigger, and tell the nigger, man, if he got a problem with me or something, you know, don't take it out in the court room. Wait. Let me get out so we can fight, whatever.

"[Female]: Oh.

"[Jackson]: Just don't come to court on me. I ain't bad mouthing anyone. I ain't trying to send nobody up for this. . . . I just want to fight about it man-to-man. . . . You know, I told everybody I didn't want nobody to do

nothing to him, you know what I'm saying? I just wanted somebody to, you know, to holler at him . . . ."

Jackson also discussed the testimony of Tywaun Cannon:

"[Jackson]: I already knew his name was Tywann [*sic*] . . . . And I'm like, 'Cuz, you know, I got some paperwork that you're snitching on me and stuff,' and he's like 'I ain't telling nobody nothing.' . . . I got the paperwork right here. . . . [¶ . . . ¶]

"I don't want him to come to court on me. . . . What I want to do is I want to let him know the same thing I just let you know. If he ain't for it, then they start looking for it, the motherfucker is going to go to jail. You know what I'm saying? He ain't even going to know what he in jail for. They are going to keep him in jail until he gets on the stand and testify. . . . He already made a statement against me about a murder. So he's my key witness. That means they don't have no other witnesses on my case but him, and that ain't even no eye witness—they can't convict me."

Another conversation dealt with Grays:

"[Jackson]: I need somebody to talk to that fool Bobo or Kenny Fly, man. That's who I really need to get at because that's who—Snuffy Nose, man, he's fat-mouthing man.

"[Female]: I'll see him. . . .

"[Jackson]: Get at Dee or Kim or somebody. See if we can get at Kenny Fly or that nigger. Bobo, man, and tell nigger, Bobo man, what's up, what can we do about this boy right here, man. You know what I'm saying? Because he (untranslatable) picked me out in the 6-pack foto [*sic*]. I read the investigation report. I'm trying to see what the fuck is going on. This kid is bad mouthing man."

Jackson also expressed concern over the testimony of Dee Ragland and suggested he needed her to change her story or he needed an alibi witness to counter her testimony:

"[Jackson]: Shit man. It's going to be fucked, man, but the lawyer told me that a long time ago. I need some witnesses, somebody say I was somewhere. . . . I told her [Jackson's attorney] but she was like Dee already, you know, said on paper, you know. All she gotta do is just say she didn't want to

get involved, man, and she wasn't—you know, she wasn't really—she under a lot of stress at the time, and she wasn't really being specific. . . .

"I [might] need to use you for reliable witnesses to say I was at Dee house . . . ."

Jackson conveyed similar concerns with regard to the testimony of Frankie Andrews:

"[Jackson]: I want to try to get in contact with somebody that know this bitch, man . . . . . . . You got to try to call somebody, either page for her or you have to try to get some people . . . on 40th [Street] so I can try to call these people man and ask them do they know this bitch 'cause I know her first and last name and she got to be in her mid-20. . . . If we can't do that—if we can't get in contact with the bitch . . . then we just need an alibi . . . . [¶] . . . [¶] It ain't no telling what the bitch end up saying. That's why I just want to make sure that the bitch . . . on the right page and this bitch is aware, you know what I'm saying, . . . of what's going, you know . . . ."

### D. *Convictions and Sentencing.*

The jury found Jackson and Price guilty of the second degree murder of Hendrix and the attempted murders of Smith and Andrews without premeditation. With respect to all three counts the jury found a principal was armed but that Jackson did not personally use a weapon. Jackson was convicted of the attempted murder of Grays. The trial court sentenced Jackson to a term of 16 years to life plus 15 years four months. The court sentenced Price to a total of 16 years to life plus 12 years eight months.

Both defendants filed timely appeals.

Jackson's appeal primarily focuses on the wiretap evidence. He contends this evidence was inadmissible because the wiretaps were unlawful under state and federal statutory law and the Fourth Amendment to the United States Constitution. He further contends even if the wiretaps were lawful the evidence was still inadmissible because of undue prejudice and lack of foundation. Jackson raises numerous other evidentiary, instructional and sentencing errors.

Price contends the evidence was insufficient to support his convictions. He also contends he did not receive a fair trial due to the court's refusal to separate his trial from Jackson's, the ineffectiveness of his counsel and the trial court's evidentiary and instructional errors. In addition Price raises a *Blakely* sentencing error. (*Blakely v. Washington* (2004) 542 U.S. 296 [159

L.Ed.2d 403, 124 S.Ct. 2531].) The People point out the abstract of judgment reflects a greater sentence than the trial court actually imposed on Price.

## DISCUSSION—JACKSON APPEAL

I. *PROCEDURAL BACKGROUND OF THE WIRETAP APPLICATIONS AND ORDERS.*

A. *Proceedings Below.*

In December 1996 the trial court granted the application of the Los Angeles County District Attorney in an unrelated case, *People v. Loot and Millsap,*[5] to intercept telephone conversations to and from pay phones at the Century Regional Detention Facility (CRDF) for a period of 30 days. We will sometimes refer to this order as the *Millsap* order. The court subsequently granted four 30-day extensions of this order. Jackson was a pretrial detainee at the CRDF, and the wiretap picked up at least 14 of his telephone conversations between February 7 and June 7, 1997.[6]

When Jackson's case was nearing trial the court signed an ex parte order authorizing the use of Jackson's telephone conversations intercepted under the *Millsap* order. Prior to trial Jackson moved to suppress evidence of his conversations pursuant to Penal Code sections 629.72 and 1538.5 on the grounds the evidence was acquired in violation of California's wiretap law[7] and the Fourth Amendment. Jackson contended the applications for the *Millsap* order and its extensions failed to demonstrate compliance with the statutory prerequisites for a wiretap, and the magistrates issuing the wiretap orders failed to make the statutorily required findings and failed to include the statutorily required provisions in the orders.[8] The trial court denied the suppression motion, and tape recordings of Jackson's telephone conversations were played at trial to show Jackson's consciousness of guilt and his attempts to intimidate witnesses and obtain perjured testimony in his defense.[9]

---

[5] *People v. Loot and Millsap* (S086578, automatic app. pending).

[6] Fourteen conversations were admitted into evidence. The parties agree additional Jackson conversations were intercepted and recorded but disagree as to the number. The parties also disagree as to whether the prosecution had to disclose the contents of these conversations to the defense even if they were not going to be offered at trial. See discussion in part IV., *post.*

[7] Penal Code sections 629.50 through 629.98. (All future statutory references are to the Penal Code unless otherwise stated.) We set out the relevant portions of the wiretap law in part I.B., *post.* Some amendments were made to the wiretap statutes following the intercepts in this case. (Stats. 2002, ch. 605, § 13.) These amendments, however, do not affect the reasoning in this opinion or the judgment. For ease of reference we will refer to the wiretap statutes as they exist today.

[8] The parties agree the legality of the wiretaps was not litigated in the trial court in *People v. Loot and Millsap,* the case which authorized them. The People do not challenge Jackson's standing to challenge the *Millsap* order, however, because section 629.72 provides "[a]ny person in any trial, hearing or proceeding, may move to suppress" wiretap evidence.

[9] See pages 140–142, *ante.*

As we will explain below, the motion to suppress should have been granted because law enforcement officers and the trial court failed to comply with several statutory requirements governing wiretap applications and orders. However, as we will also explain, admitting the wiretap evidence in this case was harmless error.

### B. *Summary of the California Wiretap Law.*

■ California's wiretap law subjects the authorization of electronic surveillance to a much higher degree of scrutiny than a conventional search warrant. We summarize the provisions of the law applicable to the present case.[10]

■ A peace officer cannot apply directly to a magistrate for a wiretap order. The application must be made by the Attorney General or a high-ranking deputy, or by a district attorney.[11] The application must contain, among other things, "a full and complete statement of the facts and circumstances" the applicant believes justify a wiretap order and a complete history of all previous applications involving any of the same persons, facilities or places and the action taken by the magistrate on each application.[12] The judge may grant the application if he or she makes the findings specified in section 629.52.[13] The order authorizing the wiretap must contain certain

---

[10] We use the term "wiretap" in this case to refer to "the interception of a wire, electronic pager, or electronic cellular telephone communication." (§ 629.50, subd. (a).)

[11] Section 629.50, subdivision (a).

[12] Section 629.50 states in relevant part: "Each application shall include all of the following information: [¶] . . . [¶] (4) A full and complete statement of the facts and circumstances relied upon by the applicant to justify his or her belief that an order should be issued, including (A) details as to the particular offense that has been, is being, or is about to be committed, (B) the fact that conventional investigative techniques had been tried and were unsuccessful, or why they reasonably appear to be unlikely to succeed or to be too dangerous, (C) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (D) a particular description of the type of communication sought to be intercepted, and (E) the identity, if known, of the person committing the offense and whose communications are to be intercepted, or if that person's identity is not known, then the information relating to the person's identity that is known to the applicant. [¶] . . . [¶] (6) A full and complete statement of the facts concerning all previous applications known, to the individual authorizing and to the individual making the application, to have been made . . . involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each of those applications."

[13] Section 629.52 provides the judge must find: "(a) There is probable cause to believe that an individual is committing, has committed, or is about to commit [one or more listed crimes including murder]. [¶] . . . [¶] (b) There is probable cause to believe that particular communications concerning the *illegal activities* will be obtained through that interception . . . . [¶] (c) There is probable cause to believe that the facilities from which [the communications] are to be intercepted are being used, or are about to be used, in connection with the

information including the identity of the person whose communications are to be intercepted, the nature and location of the communication facilities to be tapped, a particular description of the type of communication sought to be intercepted and a statement of the illegal activities to which the communication relates.[14] In addition, "[e]very order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable [and] shall be conducted so as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ."[15]

■ The Legislature recognized a wiretap may produce information communicated by someone other than the person identified in the wiretap order about a crime other than the one which justified the tap. Section 629.82, subdivision (a) extends the "plain view" doctrine to such intercepts.[16] If a judge finds the information is about the type of crime which could be used to justify a wiretap order—murder for example—and the information was otherwise acquired in accordance with the wiretap law, then the information may be disclosed and used by law enforcement agencies.[17]

■ Information obtained in conformity with the procedures described above may be shared among law enforcement agencies and used "in any criminal court proceeding"[18] subject to the usual rules of evidence.

■ A defendant who believes the information was "obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter" may move to suppress its use at trial under section 629.72. Such a

---

commission of the offense . . . . [¶] (d) Normal investigative procedures have been tried and have failed or reasonably appear . . . to be unlikely to succeed if tried or to be too dangerous."

[14] Section 629.54 states in relevant part: "Each order authorizing the interception of any wire . . . communication shall specify all of the following: (a) The identity, if known, of the person whose communications are to be intercepted, or if the identity is not known, then that information relating to the person's identity known to the applicant. (b) The nature and location of the communication facilities as to which, or the place where, authority to intercept is granted. (c) A particular description of the type of communication sought to be intercepted, and a statement of the illegal activities to which it relates. (d) The identity of the agency authorized to intercept the communications and of the person making the application. . . . ."

[15] Section 629.58.

[16] See *Harris v. United States* (1968) 390 U.S. 234, 236 [19 L.Ed.2d 1067, 88 S.Ct. 992].

[17] Section 629.82, subdivision (a) states: "If a peace officer or federal law enforcement officer, while engaged in intercepting wire . . . communications in the manner authorized by this chapter, intercepts wire . . . communications relating to crimes other than those specified in the order of authorization, but which are enumerated in subdivision (a) of Section 629.52, . . . (2) the contents and any evidence derived therefrom may be used under Section 629.78 when authorized by a judge if the judge finds, upon subsequent application, that the contents were otherwise intercepted in accordance with the provisions of this chapter. The application shall be made as soon as practicable."

[18] Section 629.78.

motion is to be made, determined and subjected to review in accordance with the procedures in section 1538.5 for motions to suppress evidence obtained in a traditional search.[19]

> II. *EVIDENCE OBTAINED AS THE RESULT OF AN UNLAWFUL WIRETAP MAY ONLY BE SUPPRESSED IF THE WIRETAP VIOLATED THE UNITED STATES CONSTITUTION OR A PROCEDURE INTENDED TO PLAY A CENTRAL ROLE IN THE LEGISLATIVE SCHEME AND THE PURPOSE OF THAT PROCEDURE WAS NOT ACHIEVED IN SOME OTHER MANNER. "GOOD FAITH," HOWEVER, IS NOT A GROUND FOR DENYING A MOTION TO SUPPRESS.*

In reviewing a trial court's ruling on a motion to suppress evidence we defer to the court's express or implied factual findings if they are supported by substantial evidence.[20] We exercise our independent judgment to determine whether, on the facts found, a search conducted by wiretap was "reasonable" under the Fourth Amendment and whether the wiretap was authorized and conducted in conformity with the federal and state statutes regulating such a search.[21]

Federal law comes into play because title III of the Omnibus Crime Control and Safe Streets Act of 1968[22] (hereafter referred to as Title III) authorizes the states to enact their own wiretap laws only if the provisions of those laws are at least as restrictive as the federal requirements for a wiretap set out in Title III.[23] As our Supreme Court has explained Title III, "in effect, establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy

---

[19] Section 629.72 states: "Any person in any trial, hearing, or proceeding, may move to suppress some or all of the contents of any intercepted wire . . . communications, or evidence derived therefrom, only on the basis that the contents or evidence were obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter. The motion shall be made, determined, and be subject to review in accordance with the procedures set forth in section 1538.5."

[20] *People v. Ayala* (2000) 23 Cal.4th 225, 255 [96 Cal.Rptr.2d 682, 1 P.3d 3].

[21] *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1192, 1196, 1204–1207 [105 Cal.Rptr.2d 187].

[22] 18 United States Code sections 2510–2520.

[23] 18 United States Code section 2516(2). What is commonly referred to as a "wiretap" is the interception of a " 'wire communication' " which is "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception . . . ." (18 U.S.C. § 2510(1).) Title III distinguishes between a wire communication and an " 'electronic communication,' " which is the "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature . . . but does not include—[¶] (A) any wire or oral communication." (18 U.S.C. § 2510(12).)

than the federal Act."[24] Thus, we look to federal and California statutes, legislative history and case law in applying the California wiretap statute.[25]

In reviewing the wiretap's conformity to federal and state law we bear in mind the dual purpose of those laws: " '(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized.' [Citation.]"[26]

█ Section 629.72 provides a motion to suppress evidence gained through a wiretap may be brought on the ground the evidence was "obtained in violation" of the wiretap statutes.

The parties disagree over whether and to what extent evidence may be suppressed because of a statutory violation.

Jackson argues that under the plain language of section 629.72 any evidence obtained through a wiretap which does not strictly conform to every statutory requirement is evidence "obtained in violation" of the statute and must be suppressed.

The People maintain a California court can never suppress evidence based on the violation of a California wiretap statute because doing so would contravene the truth-in-evidence clause of the California Constitution.[27] Rather, the court can only order suppression when suppression is required by the United States Constitution or by the federal wiretap statute, 18 United States Code section 2515,[28] and then only to the extent permitted by 18 United States Code section

---

[24] *People v. Otto* (1992) 2 Cal.4th 1088, 1098 [9 Cal.Rptr.2d 596, 831 P.2d 1178]. The Senate Report on Title III explained: "The State statute must meet the minimum standards reflected as a whole in the proposed chapter. The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation." (Sen.Rep. No. 1097, 2d Sess. (1968), reprinted in 1968 U.S. Code Cong. & Admin. News, p. 2187).

[25] See *People v. Zepeda, supra,* 87 Cal.App.4th at pages 1196, 1204–1207 construing California's requirement of a showing of necessity for the wiretap in light of federal cases construing a similar requirement in Title III.

[26] *Halpin v. Superior Court* (1972) 6 Cal.3d 885, 898 [101 Cal.Rptr. 375, 495 P.2d 1295].

[27] Article I, section 28, subdivision (d) of the California Constitution states in relevant part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings . . . ." This provision does not prevent a court from excluding evidence if exclusion is required by the United States Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 890 [210 Cal.Rptr. 631, 694 P.2d 744].)

[28] 18 United States Code section 2515 states: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any

2518(10)(a).[29] Under the latter statute wiretap evidence may be suppressed only if "(i) the communication was unlawfully intercepted; [¶] (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or [¶] (iii) the interception was not made in conformity with the order of authorization or approval."[30] The People further contend even though a wiretap does not comply with all the federal and California statutory requirements the evidence should not be suppressed if the officers who did the taping relied in good faith on the authorization order.[31]

We disagree with both parties' contentions.

> A. *Evidence Obtained from an Unlawful Wiretap May Only Be Suppressed if the Wiretap Violated the United States Constitution or a Procedure Intended to Play a Central Role in the Legislative Scheme and the Purpose of that Procedure Was Not Achieved in Some Other Manner.*

Jackson offers no persuasive support for his view the Legislature intended section 629.72 to permit suppression of wiretap evidence in the case of *any* violation of a state wiretap statute, no matter how inconsequential. His argument rests solely on the fact the Legislature authorized suppression of evidence on the ground it was "obtained in violation . . . of this chapter."[32] He points out the Legislature did not limit motions to suppress to the three grounds specified in Title III.[33]

Jackson's view that even the slightest deviation from the statutory requirements for a wiretap renders the resulting evidence inadmissible goes too far. It would lead to the suppression of relevant wiretap evidence without advancing a defendant's legitimate privacy interest or the interest of society in curbing abuse of electronic surveillance.[34]

---

court . . . of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

[29] See *People v. Otto, supra,* 2 Cal.4th at page 1098 ("a violation of the federal statute renders the illegally obtained evidence inadmissible in state court proceedings").

[30] 18 United States Code section 2518(10)(a).

[31] In *United States v. Leon, supra,* 468 U.S. at page 913 the court held evidence obtained pursuant to a search warrant which was later found to be invalid would not have to be suppressed if the officer executing the warrant reasonably relied in good faith on the warrant's validity.

[32] Section 629.72.

[33] See 18 United States Code section 2518(10)(a) quoted at this page, *ante.*

[34] See the discussion of Title III in the Senate Judiciary Committee Report on the Omnibus Crime Control and Safe Streets Act of 1968, Public Law No. 90-351. (Sen.Rep. No. 1097, *supra,* reprinted in 1968 U.S. Code Cong. & Admin. News, p. 2154.) The committee notes: "The tremendous scientific and technological developments that have taken place in the last century

The United States Supreme Court has never "[gone] so far as to suggest that every failure to comply fully with any requirement provided in Title III would render . . . interception of wire or oral communications 'unlawful.' "[35] Rather, the high court has held exclusion of wiretap evidence is required under Title III only when "there is [a] failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."[36] In other words, the statutory exclusion remedy only applies to those provisions which "play a central role in the statutory scheme."[37]

■ We believe the proper analysis of a motion to suppress wiretap evidence must ask and answer the following questions.[38] (1) Has the defendant established a violation of a provision of the wiretap law? If not, the motion is denied. (2) If a wiretap violation has been established was the provision violated one which "was intended to play a central role in the statutory scheme[?]"[39] If the provision was not intended to "play a central role," failing to comply with it will not render interceptions under the wiretap order unlawful and the motion is denied.[40] (3) If the provision violated was central to the legislative scheme was the purpose of the provision achieved in spite of the error?[41] If the purpose was achieved, the motion is denied. If the purpose was not achieved, the motion is granted. The analysis of a suppression motion focuses on violations of the statutory procedures and not on constitutional violations, because while it is possible to violate a core principle of the statute without violating the Fourth Amendment it would not seem possible to violate the Fourth Amendment without also violating a core statutory principle.

■ As previously noted, in construing the federal wiretap law the Supreme Court has repeatedly observed " '[not] every failure to comply fully with any requirement provided in Title III would render the interception of

have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance."

[35] *United States v. Chavez* (1974) 416 U.S. 562, 574–575 [40 L.Ed.2d 380, 94 S.Ct. 1849].

[36] *United States v. Giordano* (1974) 416 U.S. 505, 527 [40 L.Ed.2d 341, 94 S.Ct. 1820].

[37] *United States v. Giordano, supra,* 416 U.S. at page 528.

[38] This test is drawn from *United States v. Chun* (9th Cir. 1974) 503 F.2d 533, 542. The *Chun* test, or one substantially like it, has been followed in most other circuits. (See, e.g., *United States v. Johnson* (D.C. Cir. 1982) 225 U.S. App. D.C. 33 [696 F.2d 115, 121] & fn. 37 citing cases; *United States v. Civella* (8th Cir. 1976) 533 F.2d 1395, 1400–1401, vacated on other grounds. (1977) 430 U.S. 902.)

[39] *United States v. Giordano, supra,* 416 U.S. at page 528.

[40] *United States v. Chavez, supra,* 416 U.S. at page 579.

[41] Compare *United States v. Giordano, supra,* 416 U.S. at pages 527–528 with *United States v. Chavez, supra,* 416 U.S. at pages 573–574.

wire or oral communications "unlawful." ' [Citation.]"[42] To the contrary, suppression is required only for a " 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.' "[43]

Thus, in *United States v. Giordano*, the court held a wiretap unlawful where the application had not been approved by the Attorney General or a designated assistant attorney general as required under Title III[44] but in *United States v. Chavez* the court upheld an application actually approved by the Attorney General even though the application mistakenly stated it was approved by a designated assistant attorney general.[45] In *Giordano* the court concluded Congress intended to condition the use of wiretap procedures on the judgment of senior officials in the Department of Justice. The court upheld suppression for failure to comply with the approval provision because "[w]e are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored."[46] *Chavez*, on the other hand, concerned the statutory requirement that the application for an intercept order specify the identity of the official authorizing the application. The problem in *Chavez* was one of misidentification. Although the application had in fact been authorized by the Attorney General, the application erroneously identified an assistant attorney general as the official authorizing the application. The court concluded the mere misidentification of the official authorizing the application did not make the application unlawful within the meaning of 18 United States Code section 2518(10)(a) because the identification requirement did not play a "substantive role" in the regulatory system.[47]

*United States v. Donovan*[48] is also instructive. *Donovan* involved 18 United States Code section 2518(1)(b)(iv) which implements the Fourth Amendment's particularity requirement by requiring the wiretap application specify "the identity of the person, if known, committing the offense and whose communications are to be intercepted." The court had previously held this requirement applies to individuals whom the government has probable cause to believe are engaged in the criminal activity under investigation and

[42] *United States v. Donovan* (1977) 429 U.S. 413, 433 [50 L.Ed.2d 652, 97 S.Ct. 658].

[43] *United States v. Giordano, supra*, 416 U.S. at page 527.

[44] *United States v. Giordano, supra*, 416 U.S. at page 528.

[45] *United States v. Chavez, supra*, 416 U.S. at page 579.

[46] *United States v. Giordano, supra*, 416 U.S. at page 528.

[47] *United States v. Chavez, supra*, 416 U.S. at page 578.

[48] *United States v. Donovan, supra*, 429 U.S. 413.

whose conversations will be intercepted over the target telephone.[49] The issue in *Donovan* was "whether the Government is required to name *all* such individuals."[50] The court concluded the answer was yes: "[A] wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone."[51]

The *Donovan* court also concluded, however, the government's failure to name all such individuals in the application did not require suppression of the wiretap evidence under 18 United States Code section 2518(10)(a)(i). The court acknowledged the lower court's conclusion the identification requirement played "a 'central role' " in the statutory framework, and the legislative history of Title III indicated Congress intended the requirement "to ' "reflect . . . the constitutional command of particularization[.]" ' " Even so, the court held the government's failure to comply fully with the identification requirement did not require suppression of evidence obtained through "an intercept order that in all other respects satisfies the statutory requirements."[52] The court reasoned by identifying in the application at least some of the individuals whom the government had probable cause to believe were engaged in particular criminal activity and who would be conversing on the targeted telephone the authorizing judge had sufficient information to decide whether to issue the wiretap order. "[T]he [government's] failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization."[53] Thus the court found the government violated the letter of the law by not identifying *all* the individuals whose conversations it had probable cause to intercept yet concluded the purpose of the identification requirement was met "because the application provided sufficient information to enable the issuing judge to determine that the statutory preconditions were satisfied."[54]

■ We are not persuaded the difference in the wording of the California and federal wiretap statutes shows our Legislature intended evidence should be suppressed whenever law enforcement fails to comply precisely with any of the wiretap procedures established by state law; in other words that California law should be more restrictive with respect to wiretaps than federal law. Jackson's argument for a stricter interpretation ignores the Legislature's

---

[49] *United States v. Kahn* (1974) 415 U.S. 143, 152 [39 L.Ed.2d 225, 94 S.Ct. 977].

[50] *United States v. Donovan, supra*, 429 U.S. at page 423.

[51] *United States v. Donovan, supra*, 429 U.S. at page 428.

[52] *United States v. Donovan, supra*, 429 U.S. at page 434.

[53] *United States v. Donovan, supra*, 429 U.S. at page 435.

[54] *United States v. Donovan, supra*, 429 U.S. at page 436.

expressed intent California's law " 'conform to the federal law.' "[55] He also ignores the last sentence of section 629.72 which states: "The motion [to suppress] shall be made, determined, and be subject to review in accordance with the procedures set forth in Section 1538.5." Cases involving challenges to traditional searches under section 1538.5 have long applied a "harmless error" test when considering whether to suppress evidence because of minor violations of statutory procedures.[56] While these cases recognize "[c]ompliance with the [pre]requisites of the statute must be adhered to in order to insure adequate judicial supervision and control to preserve the constitutional guarantees [citation]" they agree "[t]echnical defects in the procedure . . . do not invalidate the search [citation]."[57] Even violations of core requirements of the search procedure such as the warrant's failure to describe the place to be searched with particularity[58] may not result in suppression of the evidence seized in the search if the People can demonstrate the warrant served the purpose of the requirement: to prevent a general rummaging around in a person's belongings.[59]

Finally, there is no merit to the People's argument the truth-in-evidence clause of the California Constitution prevents the suppression of evidence for state statutory violations. By its terms the truth-in-evidence clause does not apply to a statute "hereafter enacted by a two-thirds vote of the membership in each house of the Legislature."[60] Section 629.72 was enacted in 1995,[61] 13 years after the adoption of the truth-in-evidence clause. At the time of its enactment there were 40 members of the Senate. The bill passed the Senate by a vote of 28 to two (92 percent). There were 80

---

[55] *People v. Zepeda, supra,* 87 Cal.App.4th at page 1196, quoting Senate Committee on Criminal Procedure, Report on Assembly Bill No. 1016 (1995–1996 Reg. Sess.) as amended April 3, 1995.

[56] See for example *People v. Meza* (1984) 162 Cal.App.3d 25, 36–37 [208 Cal.Rptr. 576] and cases cited therein; and see Code of Civil Procedure section 475: "The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties."

[57] *People v. Sanchez* (1982) 131 Cal.App.3d 323, 329 [182 Cal.Rptr. 430].

[58] United States Constitution, Fourth Amendment; California Constitution, article I, section 13; Penal Code section 1525.

[59] *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 467 [29 L.Ed.2d 564, 91 S.Ct. 2022]. Numerous cases have held, for example, an ambiguity in the warrant's description of the place to be searched is not fatal if the officer conducting the search can resolve the uncertainty by referring to the affidavits supporting the warrant. See for example *Nunes v. Superior Court* (1980) 100 Cal.App.3d 915, 933–935 [161 Cal.Rptr. 351]; *People v. Peck* (1974) 38 Cal.App.3d 993, 1000–1001 [113 Cal.Rptr. 806]; *People v. Moore* (1973) 31 Cal.App.3d 919, 927 [107 Cal.Rptr. 590]; *People v. Grossman* (1971) 19 Cal.App.3d 8, 12–13 [96 Cal.Rptr. 437].

[60] California Constitution, article I, section 28, subdivision (d).

[61] Statutes 1995, chapter 971, section 10, page 5732.

members of the Assembly. The bill passed by a vote of 62 to five (77.5 percent).[62] Thus, suppression of evidence under section 629.72 is not prohibited by the truth-in-evidence clause of the California Constitution.

### B. The "Good Faith" of the Officer Executing the Wiretap Order Is Not a Ground for Denying a Motion to Suppress.

We do not agree with the People's contention wiretap evidence gathered in violation of Title III or California's wiretap law can be admitted under *Leon*'s "good-faith" exception to the exclusionary rule applicable to constitutional violations in search warrant procedures.[63]

The first and most obvious reason why *Leon* does not apply to unlawful wiretap procedures is because *Leon* "is a judicially crafted exception to an exclusionary rule that is a judicial creation." In contrast suppression under Title III "is required by a statutory mandate."[64] The United States Supreme Court recognized this distinction in *United States v. Giordano*.[65] There the court held a wiretap not preapproved by the proper justice department official violated Title III and the resulting evidence was properly excluded. The court rejected the government's contention that even if the approval requirement was not satisfied the evidence gathered should not have been suppressed. The court explained the suppression issue "does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of Title III; and in our view, the Court of Appeals correctly suppressed the challenged wiretap evidence."[66] If suppression of wiretap evidence "does not turn on the judicially fashioned exclusionary rule" we fail to see how it can turn on a judicially fashioned exception to the judicially fashioned exclusionary rule.

Even if we were writing on a clean slate there are other persuasive reasons for not applying *Leon* to wiretap procedures.

---

[62] Senate Bill No. 1016, (1995–1996 Reg. Sess.) Senate Final History, page 703.

[63] *United States v. Leon, supra*, 468 U.S. at page 913.

[64] *United States v. Spadaccino* (2nd Cir. 1986) 800 F.2d 292, 296 (holding *Leon* inapplicable to violations of federal and state wiretap procedures).

[65] *United States v. Giordano, supra*, 416 U.S. at page 524.

[66] *United States v. Giordano, supra*, 416 U.S. at page 524. The court's understanding of Title III is supported by the congressional finding: "In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings, and to prevent the obstruction of interstate commerce, *it is necessary for the Congress to define* on a uniform basis the circumstances and conditions under which the interception of wire or oral communications may be authorized, to prohibit any unauthorized interception of such communications, and *the use of the contents thereof in evidence in courts and administrative proceedings*." (Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, § 801(b) (June 19, 1968) 82 Stat. 211, italics added.)

When the Legislature enacted the California wiretap law it included three provisions specifying sanctions for violations of the statute. In section 629.72 the Legislature provided evidence obtained in violation of the wiretap statute or the Fourth Amendment is subject to a motion to suppress under section 1538.5. In section 629.84 the Legislature provided criminal penalties for violation of the statute. And, in section 629.86 the Legislature authorized any person whose conversation is intercepted in violation of the statute to bring a civil action for damages against the person making the interception. As to these criminal and civil remedies only, the Legislature provided "[a] good faith reliance on a court order is a complete defense[.]"[67] In authorizing a good faith defense to a criminal or civil action for violation of the statute but not to a motion to suppress unlawfully obtained evidence the Legislature showed it was aware of the *Leon* issue and deliberately chose not to incorporate a good faith exception into the statutory exclusionary rule.

Furthermore, because California cannot admit wiretap evidence which would be excluded under federal law,[68] California's suppression sanction must conform to the suppression sanction in Title III. Although there is disagreement among the federal courts about whether *Leon* applies to wiretap orders under Title III we believe the better reasoned view is that *Leon* should not be extended to apply to statutory violations even if those statutory violations would also be violations of the Fourth Amendment.

In adopting a statutory suppression remedy in Title III, rather than relying on the existing judicially created remedy, Congress found "a [statutory] suppression rule is necessary and proper to protect privacy. . . . The provision thus forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the standards of the new chapter *will sharply curtail the unlawful interception of wire and oral communications.*"[69] Since the entire rationale of the *Leon* good faith exception rests on the premise excluding evidence seized unlawfully but in good faith will *not* deter Fourth Amendment violations[70] it is difficult to square the statutory suppression remedy in Title III with an exception to suppression based on "good faith."

---

[67] Section 629.86.

[68] See discussion at pages 146–147, *ante.*

[69] Senate Report, *supra*, 1968 United States Code Congressional and Administrative News at page 2185. (Italics added.) The Senate Report also states: "No one quarrels with the proposition that the unauthorized use of [wiretaps] by law enforcement agents should be prohibited. It is not enough, however, just to prohibit the unjustifiable interception, disclosure, or use of any wire or oral communication. . . . The perpetrator must be denied the fruits of his unlawful actions in civil *and criminal proceedings*. Each of these objectives is sought by the proposed legislation." (*Id.* at p. 2156, italics added.)

[70] *United States v. Leon, supra,* 468 U.S. at page 921.

On the other side of the coin, experience shows in most cases the absence of a good faith exception to the statutory exclusion rule would not prevent the prosecution from using "inherently trustworthy tangible evidence" obtained in good faith reliance on a wiretap order.[71] The *Leon* good faith exception is primarily intended to address suppression motions based on an alleged lack of probable cause for a search warrant,[72] an issue on which "[r]easonable minds frequently may differ."[73] In contrast, cases applying the good faith exception to wiretap proceedings have generally addressed suppression motions based on minor or technical violations of Title III which would not be grounds for suppression even in the absence of a good faith exception.[74]

It is also significant Congress did not include a "good faith" exception when it enacted the exclusionary rules in 18 United States Code sections 2515 and 2518(10)(a). The Senate Report explaining Title III noted its statutory exclusionary rule, "largely reflects existing law."[75] Because there was no *Leon* "good faith" exception in 1968 when Title III was enacted Congress could not have contemplated much less intended a good faith exception to the exclusionary rule in Title III. Congress has had 21 years since the *Leon* decision to add a good faith exception to Title III. It has not done so.

Another weakness in the argument for a "good faith" exception appears when we consider how this exception would work in practice. If there is a violation of a statutory provision which is "central" to the legislative scheme but not constitutionally mandated, such as acquiring the proper official's approval for the wiretap application, or showing why a wiretap is superior to a conventional search, the court must suppress the evidence.[76] If, on the other hand, the wiretap order fails to satisfy a "central" statutory provision which is also constitutionally mandated, such as having a basis in probable cause and particularly describing the persons to be targeted and conversations to be intercepted, the evidence would not be suppressed if the officer executing the order had an objective good faith belief in its validity. Thus, nonconstitutional violations of the wiretap statute would be more likely to lead to the suppression of evidence than constitutional violations. We do not believe this is what Congress or the California Legislature intended.

As previously noted, some federal courts have held the *Leon* good faith exception applies to applications and orders for wiretaps. We find their reasoning unconvincing.

---

[71] See *United States v. Leon, supra,* 468 U.S. at page 907.

[72] *United States v. Leon, supra,* 468 U.S. at pages 900, 914–915, 918, 921–923.

[73] *United States v. Leon, supra,* 468 U.S. at page 914.

[74] See discussion at pages 151–152, *ante.*

[75] Senate Report, *supra,* 1968 United States Code Congressional and Administrative News at page 2185.

[76] *United States v. Giordano, supra,* 416 U.S. at pages 515, 528.

In *United States v. Moore* the court concluded *Leon* applied because the suppression statute makes the decision to exclude evidence discretionary ("If the motion is granted . . .")[77] and the legislative history of Title III "expresses a clear intent to adopt suppression principles developed in Fourth Amendment cases."[78] Both reasons are unpersuasive. The sentence cited by the court in *Moore* reads in full: "If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter."[79] Read in context the phrase "If the motion is granted . . ." was not intended to confer discretion on the court to deny the motion even if the interception is shown to have been unlawful unless, as is highly unlikely, it was also intended the court should have discretion to grant the motion even if the interception is shown to have been lawful. Rather, the sentence simply states the consequence which follows a ruling for the defendant on the merits of the suppression motion. In addition, the legislative history the *Moore* court cites does not support its argument. The Senate Report at the page cited by the court states the suppression provision in Title III "largely reflects existing law" and there is "no intention . . . to press the scope of the suppression role beyond present search and seizure law."[80] But as we pointed out above, "existing law" did not include a good faith exception to the exclusionary rule when Title III was enacted. Therefore, denying that exception in motions to suppress wiretap evidence could not "press the scope of the suppression role beyond present search and seizure law."

In *United States v. Malekzadeh* the court held under *Leon* the evidence gathered through a wiretap should not be suppressed even if some of the information used to show probable cause was unlawfully obtained because the officer's use of that information was "objectively reasonable."[81] The court's opinion does not cite or discuss the language of the wiretap suppression statutes, their legislative history or the Supreme Court opinions regarding their application.

One court has held *Leon* applies to wiretaps based on an amendment to Title III enacted after the *Leon* decision. This addition to 18 United States Code section 2518(10) states: "The remedies and sanctions described in this

---

[77] 18 Unites States Code section 2518(10)(a).

[78] *United States v. Moore* (8th Cir. 1994) 41 F.3d 370, 376, citing the Senate Report, *supra*, 1968 United States Code Congressional and Administrative News at page 2185.

[79] 18 United States Code section 2518(10)(a).

[80] Senate Report, *supra*, 1968 United States Code Congressional and Administrative News at page 2185.

[81] *United States v. Malekzadeh* (11th Cir. 1988) 855 F.2d 1492, 1497.

chapter with respect to the interception of *electronic communications* are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications."[82] In *U.S. v. Ambrosio* the court concluded this provision limits Title III's remedies and sanctions to nonconstitutional violations of the statute, leaving constitutional violations subject to the judicially created exclusionary rule and, consequently, the *Leon* good faith exception to the rule.[83] The court's conclusion is flawed, however, because the court failed to note this provision only applies to *electronic communications* such as e-mail—not to wire communications such as telephone calls. When Congress amended Title III to include electronic communications it did not amend the suppression statutes, 18 United States Code sections 2515 and 2518(10)(a) which continue to apply only to "wire or oral communication."[84] As a result there is no statutory suppression remedy for a violation of Title III procedures in intercepting electronic communications.[85] The only way such evidence can be suppressed is through the judicially created exclusionary remedy for constitutional violations.[86]

This same court also reasoned that if under *Franks v. Delaware* a defendant can challenge a wiretap on the ground the application for the order contained deliberately false and misleading allegations[87] and the government can defend on the ground the affiant included the information in good faith[88] then good faith should also be a defense to other alleged insufficiencies in the application.[89] This argument begs the question. While the inclusion in a wiretap application of deliberately false or misleading information would, if sufficiently material, violate the "probable cause" requirement of the Fourth Amendment it would also violate the Title III requirement an application

[82] 18 United States Code section 2518(10)(c), italics added. (Electronic Communications Privacy Act of 1986, Pub.L. No. 99-508, § 101(e) (Oct. 21, 1986) 100 Stat. 1848.) For the distinction between "wire communications" and "electronic communications" see footnote 23, *ante*.

[83] *U.S. v. Ambrosio* (S.D.N.Y. 1995) 898 F.Supp. 177, 187.

[84] This difference in remedies was not an oversight. The Senate Report on the act states: "The purpose of this provision is to underscore that, as a result of discussions with the Justice Department, the Electronic Communications Privacy Act does not apply the statutory exclusionary rule contained in title III of the Omnibus Crime Control and Safe Streets Act of 1968 to the interception of electronic communications." (Sen.Rep. No. 99-541, (1986), reprinted in 1986 U.S. Code Cong. & Admin. News, p. 3577.)

[85] When a statutory violation occurs with respect to an electronic communication, the individual's only remedies are criminal and civil sanctions against the offending government officials. (18 U.S.C. §§ 2511(4), 2520.)

[86] For further discussion of the Electronic Communications Privacy Act and why it does not incorporate a "good faith" exception into Title III, see generally Lieb, *E-Mail and the Wiretap Laws: Why Congress Should Add Electronic Communications to Title III's Statutory Exclusionary Rule and Expressly Reject a "Good Faith" Exception* (1997) 34 Harvard Journal on Legislation 393.

[87] See *U.S. v. Ferrara* (D.Mass. 1991) 771 F.Supp. 1266, 1273.

[88] See *Franks v. Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674].

[89] *U.S. v. Ambrosio, supra*, 898 F.Supp. at page 188.

contain "a full and complete statement of the facts."[90] Thus it would not be necessary for the defendant to invoke *Franks* in order to challenge a deliberately false application any more than it would be necessary for him to invoke the judicial exclusionary rule to challenge the probable cause for the order. Although the Supreme Court has never directly addressed the issue, it has indicated in dicta it would uphold the suppression of evidence under the statutory provisions of Title III in a case of deliberate misrepresentation by the government.[91]

Finally, the policy reasons which led the Supreme Court to adopt a good faith exception to the judicial exclusionary rule in cases involving search warrants do not apply to the statutory exclusionary rule in cases involving wiretap orders.

In the typical search warrant procedure a police officer takes an affidavit he believes shows "probable cause" for a particular search to a magistrate and asks the magistrate to issue a warrant authorizing the search. The police officer is not an attorney much less a criminal law specialist but has had some training in the requirements of the Fourth Amendment and the need to operate within its limits.[92] In *Leon*, the court reasoned that when the officer presents her affidavit in good faith and a judge or magistrate approves it the deterrence rationale of the exclusionary rule does not apply because in those cases "there is no police illegality and thus nothing to deter."[93]

Throughout its opinion the *Leon* majority stressed the true check on law enforcement's abuse of its power to search and seize is not the exclusionary rule but " 'the detached scrutiny of a neutral magistrate.' "[94] The close inspection of a diligent magistrate, the court stated, "is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.' "[95] Thus, if the search warrant procedure was defective it is not the police officer who is to blame. "It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question

---

[90] 18 United States Code section 2518(1)(b).

[91] See *United States v. Donovan, supra,* 429 U.S. at page 436, footnote 23; *United States v. Chavez, supra,* 416 U.S. at page 572.

[92] *United States v. Leon, supra,* 468 U.S. at pages 919–920, footnote 20.

[93] *United States v. Leon, supra,* 468 U.S. at pages 920–921.

[94] *United States v. Leon, supra,* 468 U.S. at page 913.

[95] *United States v. Leon, supra,* 468 U.S. at pages 913–914.

the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."[96]

In contrast, the procedure for obtaining a wiretap order shows Congress was not satisfied it could fully trust a magistrate with the far-reaching invasion of privacy possible through a wiretap. Under Title III a police officer cannot go directly to a magistrate and ask for a wiretap. Rather, the person seeking the order, usually an assistant United States attorney, must first obtain the personal approval for the wiretap from the United States Attorney General or a statutorily authorized designee.[97] Only after gaining the sentient review and approval of the Attorney General or designee may the attorney present the wiretap request to a magistrate. In addition to the information required in an affidavit for a traditional search warrant, such as facts showing probable cause for the search and particularly identifying the place or thing to be searched, a wiretap application must include inter alia the name of the justice department official who authorized the application, a description of the particular offense being investigated (which must be one of the offenses specified in the statute), facts showing the necessity for a wiretap as opposed to a traditional search, and information concerning all previous wiretap applications involving the same targeted persons, facilities or places specified in the current application.[98] Like the search warrant procedure, in the wiretap procedure it is the magistrate's responsibility to determine whether the government's allegations establish the statutory grounds for a wiretap. But unlike the search warrant procedure the magistrate is not alone in making this determination. "The Act plainly calls for the prior, informed judgment of enforcement officers desiring court approval for intercept authority . . . . The mature judgment of a particular, responsible Department of Justice official is interposed as a critical precondition to any judicial order."[99]

In *Giordano*, the Supreme Court recognized Attorney General review of wiretap applications was intended to prevent the issuance of wiretap orders even in cases where magistrates would have approved them. "It is reasonable to believe," the court stated, "that such a precondition would inevitably foreclose resort to wiretapping in various situations where investigative personnel would otherwise seek intercept authority from the court and the court would very likely authorize its use."[100]

Thus, if an appellate court determines wiretap evidence was gathered under a legally erroneous order, the government cannot place the blame on the

---

[96] *United States v. Leon*, 468 U.S. at page 921.

[97] 18 United States Code section 2516(1); see *United States v. Giordano, supra*, 416 U.S. at page 508.

[98] 18 United States Code section 2518(1)(a)–(f).

[99] *United States v. Giordano, supra*, 416 U.S. 515–516.

[100] *United States v. Giordano, supra*, 416 U.S. at pages 527–528.

magistrate who issued the order. The fact the order was obtained by a government lawyer in good faith after review by a judicial officer does not inoculate illegally gained evidence from suppression any more than the fact evidence was introduced at trial by a government lawyer in good faith after review by the trial court inoculates illegally gained evidence from review on appeal from the judgment.

We conclude, therefore, "good faith" in applying for or executing a wiretap order does not trump the statutory exclusion provisions when there has been a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."[101]

## C. *Summary.*

In summary we hold evidence gained through a wiretap should be excluded under sections 629.72 and 1538.5 when the defendant has established the evidence was obtained in violation of the Fourth Amendment of the United States Constitution or the provisions of Title 15, Chapter 1.4 of the Penal Code (sections 629.50 through 629.98), the statutory provision violated was intended to play a central role in the authorization and execution of wiretaps and the People have failed to establish the statutory purpose was achieved in spite of the error. The good faith of the law enforcement officers preparing, approving or executing the wiretap order is not relevant in determining whether the evidence should be excluded.

## III. *THE WIRETAP EVIDENCE SHOULD HAVE BEEN SUPPRESSED BECAUSE THE WIRETAP ORDERS FAILED TO IDENTIFY ANY OF THE PERSONS WHO WERE TARGETS OF THE WIRETAPS. IN THIS CASE, HOWEVER, FAILURE TO SUPPRESS THE EVIDENCE WAS NOT PREJUDICIAL.*

### A. *Jackson Did Not Waive His Right to Challenge the Wiretap Evidence on Appeal.*

The People maintain Jackson waived any challenge to the wiretap because he stipulated to its validity at trial. We disagree with the People's interpretation of the stipulation.

After both sides had presented their evidence and in the presence of the jury the prosecutor and defense counsel stipulated "the wiretap tapes were

---

[101] *United States v. Giordano, supra,* 416 U.S. at page 527.

obtained pursuant to a lawful court order for a wiretap; however, that wiretap was directed at another individual entirely, not Mr. Jackson, not anybody connected with this case, and the phone calls were intercepted pursuant to that wiretap." The People argue this stipulation constituted a judicial admission on the part of the defendant that the *Millsap* order was lawful and prevents him from challenging the order on appeal.

Oral statements of counsel may be treated as judicial admissions if they were intended to be such or reasonably construed by the court or the other party as such.[102] This rule, however, does not apply "to admissions which are improvidently or unguardedly made, or which are in any degree ambiguous."[103]

The stipulation at issue occurred at the end of a lengthy and contentious trial when counsel for both sides and the court were undoubtedly fatigued. Jackson's counsel may have overlooked the word "lawful" in the stipulation because her focus was on getting the People to concede the wiretap was not directed at Jackson and law enforcement had no cause to believe Jackson was using the jail telephones for any illicit purpose. This concession combined with the exculpatory or at least ambiguous statements in some of Jackson's conversations could help the defense explain away Jackson's more damaging statements.

Furthermore, having vigorously fought a motion to suppress the wiretap evidence at the start of trial it does not seem reasonable Jackson's counsel would concede the issue at the close of trial and deliberately throw away a potential winning issue should there be an appeal. It is more likely if counsel actually intended to stipulate the wiretap order was "lawful" she only intended to stipulate the trial court had found the order lawful, not to concede its lawfulness.

Finally, the prosecution had nothing to gain by having Jackson stipulate to the lawfulness of the *Millsap* order. The prosecution already defeated the defense motion to suppress the wiretap evidence, the trial was over, the evidence was in, the prosecution would not have to relitigate the issue in the trial court.

We conclude, therefore, Jackson's stipulation the wiretaps were obtained pursuant to a "lawful court order" did not waive the lawfulness of the order as an issue on appeal.

---

[102] See, for example, *Scafidi v. Western Loan & Bldg. Co.* (1946) 72 Cal.App.2d 550, 562 [165 P.2d 260].

[103] *Scafidi v. Western Loan & Bldg. Co., supra*, 72 Cal.App.2d at page 562.

As a fallback position the People argue Jackson should not be permitted to challenge the wiretaps on appeal on grounds which he did not raise in his suppression motion in the trial court.[104] While the People's argument has merit we have concluded the best course of action is to address some of Jackson's arguments even though they are raised for the first time on appeal. We do so for several reasons. As the People concede, if we do not address these arguments now we will have to address them later in discussing Jackson's claim of ineffective assistance of counsel based on his counsel's failure to raise the arguments in the suppression motion. In addition, some of Jackson's new arguments raise important questions about the procedures to be followed by law enforcement in applying for wiretap orders and by the trial courts in granting them. These additional issues have been fully briefed by the People and are ripe for decision. Finally, because we find the trial court's errors in admitting the wiretap evidence were harmless, the People were not prejudiced by the inability to respond to these arguments at the hearing on the suppression motion.

> B. *The Trial Court Erred in Not Suppressing the Wiretap*
> *Evidence Because the Orders Failed to Identify any Persons*
> *Who Were the Targets of the Wiretaps.*

Section 629.54 states in relevant part "[e]*ach order* authorizing the interception of any wire . . . communication *shall* specify . . . [¶] (a) [t]he identity, if known, of the person whose communications are to be intercepted, or if the identity is not known, then that information relating to the person's identity known to the applicant." (Italics added.)

The defect in the *Millsap* order is not its failure to identify Jackson as a person whose conversations were to be intercepted.[105] Rather, the *Millsap* order was unlawful because it did not identify Millsap or any other person by name or description as required by section 629.54, subdivision (a). Instead, the order gave law enforcement the authority to intercept the telephone conversations of hundreds of CRDF inmates without any showing of probable cause to believe these persons had committed, were committing or were about to commit a crime for which a wiretap could be authorized.

Instead of stating the names of the persons whose conversations are to be intercepted, and who are named in the application, the order merely portrays these persons as "the users of" certain specified telephone numbers.

---

[104] *People v. Zepeda, supra,* 87 Cal.App.4th at pages 1192–1193.

[105] As we explained above, section 629.82 covers the situation where an order directed at the conversations of A happens to intercept the conversations of B. See discussion at page 145, *ante.* Because we hold the wiretap order in this case violated section 629.54, subdivision (a) we need not reach the question whether the order would have otherwise covered Jackson's conversations under the spillover provision of section 629.82.

██ An order which authorizes the police to intercept the conversations of "the users" of particular pay telephones is unlawful under California's wiretap statute and violates the Fourth Amendment.

██ The order violates section 629.54, subdivision (a) because the record shows the identities of Millsap and seven of his fellow gang members were known to the district attorney when he made the application for the order and therefore these identities had to be stated in the order. Even if these individuals' identities had not been known, an order authorizing the sheriff to intercept the conversations of anyone using one of the pay telephones at a county jail would not be permissible for two reasons. Section 629.54, subdivision (a) provides that where the identity of the person to be surveiled is not known the order must state the "information relating to the person's identity known to the applicant." Clearly, identifying the person simply as a "user" of the telephone does not satisfy the statute. Jail detainees come and go and it would be impossible for the district attorney to know when he made the application for the wiretap order and who the "users" of the telephone would be when the order was executed. More importantly, the application for a wiretap must demonstrate probable cause for the surveillance including "details as to the particular offense" the surveiled party is believed to have committed, be committing, or be about to commit.[106] It is unthinkable the district attorney could articulate probable cause to intercept the conversations of each of the hundreds of inmates at the CRDF.

Furthermore, an order permitting the sheriff to intercept the conversations of "all users" of a telephone available to hundreds of persons smacks of the "general warrant" or "writ of assistance" prevalent in colonial America and motivating factors behind the Declaration of Independence and the Fourth Amendment's requirement persons or things to be seized must be "particularly describ[ed]."[107] These writs not only permitted a general search of one individual's home and belongings but a search of every house in a given area or, as in the present case, every person in a given group.[108]

The People argue the *Millsap* orders in this case were valid because they came close enough to the statutory requirements to satisfy concerns about privacy and arbitrary, unchecked searches and seizures. The People maintain it is sufficient the names of the individuals whose communications were particularly targeted were known to the authorizing judge through the information contained in the affidavits attached to the applications for the orders.

---

[106] Section 629.50, subdivision (a)(4)(A).

[107] United States Constitution, Fourth Amendment; *Berger v. New York* (1967) 388 U.S. 41, 58 [18 L.Ed.2d 1040, 87 S.Ct. 1873].

[108] *Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 670 [132 L.Ed.2d 564, 115 S.Ct. 2386] (dis. opn. of O'Connor, J.)

The People's argument, however, cannot be squared with the plain wording of section 629.54 which states: "Each *order* . . . shall specify all of the following . . . ." (Italics added.) We fail to see how an order which does not "specify all of the following" can nevertheless be deemed to comply with the statute because the missing information is contained in the application for the order. Obviously, if the Legislature believed putting the information in the application was sufficient it would not have required putting the information in the order as well.

In support of their argument the People cite to *U.S. v. Cunningham*.[109] The wiretap order in *Cunningham* referred to "oral communications," "wire communications," "wire and oral communications" and "wiretaps." The district court granted the defendants' motion to suppress all evidence gathered by electronic surveillance under the order. The Court of Appeals reversed. The appellate court agreed the order did not inform the objective reader just what interceptions were authorized—wire communications, oral communications or both—and therefore the order violated federal wiretap law because it did not contain "a particular description of the type of communication sought to be intercepted . . . ."[110] Nevertheless, the court held, the lower court erred in suppressing the evidence gathered under the order. The court found the statutory purpose of the "particular description" requirement had been achieved because the authorizing judge and the executing officer knew what was supposed to be covered by the order. Thus, "despite the seriously confusing language" the court held "there was no substantial threat that this officer would intercept communications other than as authorized."[111] *Cunningham* does not stand for the general proposition the requirement certain information be contained in an order is satisfied if the information is contained instead in the application for the order or the affidavit accompanying the application. On the contrary, the appellate court found the order "inadequate."[112] What saved the order in *Cunningham* was the court's finding under the particular circumstances of the case the statutory purpose of the "particular description" requirement had been achieved despite the fact the order did not comply with the statute.

The question before us is whether the statutory and constitutional purposes in requiring particularity in a wiretap order may still be achieved even if the particularity is contained only in the application for the order. We hold under the circumstances of the present case the answer has to be no.

---

[109] *U.S. v. Cunningham* (1st Cir. 1997) 113 F.3d 289.

[110] 18 United States Code section 2518, subdivision (4)(c) (compare section 629.54, subdivision (c)); *U.S. v. Cunningham, supra*, 113 F.3d at page 293.

[111] *U.S. v. Cunningham, supra*, 113 F.3d at page 294.

[112] *U.S. v. Cunningham, supra*, 113 F.3d at page 293.

This is not a case like *Cunningham* or similar California cases[113] in which the executing officer can resolve any ambiguity in the order or warrant by referring to the supporting affidavit. Here there is no ambiguity. The order plainly authorizes the interception of conversations by all "users" of the specified pay telephones at the CRDF. Even if there was an ambiguity it could not have been resolved by reference to the application or affidavits because upon issuing the order the trial court directed those documents sealed.

Jackson raises 35 additional grounds for suppressing the wiretap evidence. However, as we explain below, we conclude the admission of this evidence was harmless beyond a reasonable doubt. Therefore we need not prolong this opinion with a detailed analysis of Jackson's remaining contentions.[114]

### C. *Failure to Suppress the Wiretap Evidence Was Harmless Beyond a Reasonable Doubt.*

We will apply the *Chapman* standard of reversible error because the particularity requirement is an aspect of the Fourth Amendment as well as the state and federal statutory schemes.[115]

Jackson argues the People's evidence was mainly circumstantial and therefore far from "overwhelming." Furthermore, the prosecution's case depended in large part on the inferences of guilt which could be drawn from Jackson's statements unlawfully captured on the wiretaps. Therefore it cannot be said the trial court's admission of the wiretap evidence was "harmless beyond a reasonable doubt."

▆▆▆ Contrary to Jackson's suggestion, circumstantial evidence is not subjected to a more rigorous standard of review than direct evidence in determining the sufficiency of the evidence.[116] In any event, Jackson's convictions were not based solely on circumstantial evidence. They were

---

[113] See cases cited in footnote 59, *ante.*

[114] See *People v. Yeoman* (2003) 31 Cal.4th 93, 114 [2 Cal.Rptr.3d 186, 72 P.3d 1166] (appellate court need not examine merits of the defendant's claims of error if the defendant cannot show prejudice). Furthermore, it is a long established rule that an appellate court need not "set forth and dispose of, seriatim, each and every item which appellant's counsel chooses to characterize as an 'issue' in the case." (*People v. Ramos* (1981) 118 Cal.App.3d 278, 290 [173 Cal.Rptr. 64].) An opinion is not "a brief in reply to the counsel against whose views we decide;" it is a "statement of conclusions, and of the principal reasons which have led us to them." (*Holmes v. Rogers* (1859) 13 Cal. 191, 202, quoted in *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1262 [82 Cal.Rptr.2d 85, 970 P.2d 872].)

[115] *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Tewksbury* (1976) 15 Cal.3d 953, 972 [127 Cal.Rptr. 135, 544 P.2d 1335].

[116] *People v. Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253].

primarily based on direct evidence of his own admissions and the eyewitness testimony of Marquis Grays, the victim in count IV.[117] Voluntary extrajudicial statements by the defendant have long been recognized as "powerfully incriminating."[118]

Jackson gives the wiretap evidence far too much credit for his convictions. Although Jackson is heard making statements which could be interpreted as urging friends and associates to intimidate potential witnesses against him, Jackson never specifically asks anyone to do anything illegal and in one conversation expressly rejects the suggestion of harming Lewis.[119] Even though Jackson urges his friends to talk to some of the witnesses about changing the stories they are telling the police this is not necessarily proof of an unlawful attempt to suppress evidence or intimidate witnesses. Jackson was cloaked with the presumption of innocence and an innocent person would naturally try to get the witnesses against him to change their statements to the police if those statements were untrue or misleading. Jackson's conversations suggest he believed Cannon, Davis and Frankie Andrews were not telling the truth in their statements to the police. Furthermore, the trial court instructed the jury that, even if it found Jackson attempted to suppress evidence against himself, such as by intimidating witnesses, "this conduct is *not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.*" In contrast to the evidence of consciousness of guilt found in the wiretaps, which was equivocal at best, the People produced far more persuasive evidence of consciousness of guilt by showing when the police attempted to arrest Jackson he broke away and ran and after being apprehended he resisted being handcuffed.[120]

As to counts I, II and III Jackson points out there were no eyewitnesses to the murder of Hendrix and the attempted murders of Smith and Andrews; nor did any physical evidence link him to these crimes. Other than the erroneously admitted wiretap evidence the only evidence tying him to these crimes was his purported admissions to fellow gang members. But these witnesses subsequently repudiated their statements to the police.

As to count four, the victim of the alleged attempted murder, Marquis Grays, recanted his identification of Jackson as the shooter in his testimony at

---

[117] See discussion at pages 139–140 *ante.*

[118] *Bruton v. United States* (1968) 391 U.S. 123, 135 [20 L.Ed.2d 476, 88 S.Ct. 1620].

[119] The conversation went as follows: "[Female]: You gonna get that ass, huh? [¶] [Jackson]: No. I ain't going to fuck with him. I ain't even tripping like that. [¶] [Female] You ain't tripping like that? [¶] [Jackson]: No. Because that's going to fuck me up. . . . The only thing I'm trying to do is I'm just trying to highlight the nigger, and tell the nigger, man, if he got a problem with me or something, you know, don't take it out in the court room. Wait. Let me get out so we can fight, whatever."

[120] California recognizes flight as circumstantial evidence of guilt. See section 1127c.

the preliminary hearing. The only other witness, Frankie Andrews, could not identify Jackson at trial as the person she had seen shouting gang slogans at Grays a few days before someone tried to kill him.

Jackson argues the fact that Cannon and Davis subsequently repudiated their statements to the police and Grays refused to testify at trial "almost certainly" would have led to his acquittal on all charges had the People not been able to explain these witnesses' conduct by using the wiretap evidence to convince the jury the witnesses had been intimidated by Jackson or his fellow gang members. Again Jackson overstates the importance of the wiretap evidence.

Witnesses in gang-related cases frequently refuse to appear at trial or change their stories once they get on the witness stand, but the defendants in these cases are convicted with regularity. Jurors are the sole judges of a witness's credibility and they are rightfully suspicious of trial testimony which deviates 180 degrees from what the witness told the police or which contradicts other solid evidence.[121] Here the jurors had to choose between statements by a witness to the police when the witness thought the statement would not leave the room and did not know it was being recorded, or contradictory statements by the same witness at a public trial with numerous gang members sitting in the courtroom and hallway. Any rational juror would find the former statements more credible. In addition, the jurors in this case were instructed the witnesses' prior inconsistent statements could be considered "not only for the purpose of testing [their] credibility . . . but also as evidence of the truth of the facts stated" on the former occasions.[122]

Jackson argues the evidence of his conversation regarding Frankie Andrews was particularly prejudicial because he repeatedly refers to her as a "bitch" and asks his friends to find out where she lives and get her to change her testimony. Actually, Jackson's conversation regarding Andrews was the least inculpatory and most consistent with his innocence. As the jury knew from other evidence, Jackson's statements concerning Andrews occurred shortly after Detective Whalan had testified at the preliminary hearing that Andrews identified Jackson as the person who shot and killed Carl Caldwell. Whalan admitted at trial his testimony at the preliminary hearing was incorrect and Andrews had not identified Jackson as the killer in the Caldwell case.[123] But at the time Jackson made his statements regarding Andrews he believed she had falsely identified him as Caldwell's murderer and thus his anger at her and his desire to get her to change her testimony was consistent

---

[121] For example, at trial Curtis Davis, who had known Jackson for 20 years, denied knowing him and denied it was his voice on the tape-recorded statements to the police which were played to the jury.

[122] CALJIC No. 2.13; see Evidence Code section 1235.

[123] See discussion of Detective Whalan's testimony in part V, *post.*

with the reaction of an innocent person. The jury heard evidence that another person was tried and convicted for the Caldwell murder and the charge was dropped against Jackson. Jackson's trial counsel reminded the jury of this evidence in her closing argument.

In any event it was not Jackson's statements on the telephone which led to his convictions. Rather, it was his earlier statements to Cannon and Davis in which he admitted killing Hendrix and shooting at Smith and Andrews which resulted in his convictions on counts one, two and three, and the statements to the police by Grays and Frankie Andrews which led to his conviction on count four. Taken together with the circumstantial evidence there was compelling proof of Jackson's guilt.[124]

For the reasons stated above we find beyond a reasonable doubt the result would have been the same even if the wiretap evidence had been excised from the trial.[125]

### IV. THE PROSECUTOR MUST DISCLOSE ALL STATEMENTS OF THE DEFENDANT INTERCEPTED ON A WIRETAP. THE FAILURE TO DO SO IN THIS CASE, HOWEVER, WAS HARMLESS ERROR.

The prosecution disclosed to the defense 14 of Jackson's conversations intercepted under the *Millsap* order. The People concede additional conversations were intercepted and not disclosed although the parties disagree on the number of such conversations.

Jackson contends the prosecution's failure to disclose all of his intercepted conversations violated his discovery rights under section 1054.1 which states: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information . . . : [¶] . . . [¶] (b) Statements of all defendants." The People argue their disclosure obligation under section 1054.1, subdivision (b) only applies to "relevant" statements by a defendant and in any event the wiretap law, section 629.70, subdivision (b), only requires disclosure to the defendant of "interceptions from which evidence against the defendant was derived[.]" We conclude Jackson's interpretation of section 1054.1 is correct. Under the circumstances of this case, however, the failure to disclose all of Jackson's intercepted conversations was harmless error.

---

[124] Our disposition of Jackson's claim of prejudice also disposes of his claim there was insufficient evidence to support his conviction.

[125] Compare *People v. Wojtkowski* (1985) 167 Cal.App.3d 1077, 1083–1084 [213 Cal.Rptr. 846] (erroneous admission of intercepted telephone conversation harmless beyond a reasonable doubt where defendant previously admitted committing the offenses and there was an eye witness).

 We reject the People's attempt to reduce the prosecution's discovery obligation from disclosure of the "statements of all defendants" to the "*relevant* statements of all defendants." The plain language of section 1054.1, subdivision (b) requires the disclosure of all statements of a defendant without qualification.[126] In contrast, the statute only requires disclosure of "relevant real evidence"[127] and "relevant written or recorded statements of witnesses[.]"[128] Clearly if the drafters of the criminal discovery law had intended to limit the prosecution's disclosure requirement to relevant statements of the defendant they knew how to say so. They did not. Instead they required the disclosure of defendants' statements without limitation, except as provided in section 1054.7.[129] When construing a statute it is not the function of a court "to insert what has been omitted."[130]

We also note that prior to the enactment of the criminal discovery procedures through the adoption of Proposition 115[131] our Supreme Court had held as a matter of judicial policy a defendant's right to inspect his own statements to the police "is ordinarily vital for the intelligent and efficient preparation of one's defense[.]"[132] This right of discovery was not intended to lead only to the ascertainment of "relevant" evidence but to provide counsel "with information which might lead to the discovery of other evidence important to the defense. [Citation.]"[133] We find nothing to suggest the statutory discovery procedures were intended to alter this long-standing disclosure policy.

---

[126] The trial court may, however, deny, restrict or defer disclosure for "good cause." (§ 1054.7.) "Good cause" is defined by the statute as "threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement." (*Ibid.*) Thus the defendant's statements would not have to be disclosed, for example, if a court found disclosure might interfere with an ongoing investigation into racketeering or terrorism.

[127] Section 1054.1, subdivision (c).

[128] Section 1054.1, subdivision (f).

[129] See footnote 126, *ante*.

[130] Code of Civil Procedure section 1858.

[131] Proposition 115 adopted in 1990 added sections 1054 through 1054.7 to the Penal Code. Prior to the enactment of Proposition 115 California did not have a uniform statutory system of law governing discovery in criminal cases. Although some statutory provisions existed, such as sections 1043–1045 governing discovery of police officers' files under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305], criminal discovery was largely governed by judicially created rules. (*People v Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1311 [96 Cal.Rptr.2d 264].) Proposition 115 changed all that by enacting "a comprehensive and very nearly exclusive system of discovery in criminal trials." (*People v. Superior Court (Barrett)*, *supra*, 80 Cal.App.4th at page 1311.) Among other things, the new statutes prescribed what the prosecution must disclose to the defense (section 1054.1), what the defense must disclose to the prosecution (section 1054.3) and the procedures under which this exchange of information would occur (sections 1054.5, 1054.7).

[132] *Joe Z. v. Superior Court* (1970) 3 Cal.3d 797, 803 [91 Cal.Rptr. 594, 478 P.2d 26].

[133] *Joe Z. v. Superior Court*, *supra*, 3 Cal.3d at page 803.

■ An apparent conflict exists between the general criminal discovery statutes discussed above and the wiretap statute when it comes to disclosure of a defendant's statements. The criminal discovery law requires the prosecution to disclose *all* statements by the defendant.[134] The wiretap statute, which predates Proposition 115, only requires disclosure of the defendant's statements "from which evidence against the defendant was derived[.]"[135] Our task is to determine which disclosure provision should apply. For the reasons explained below we conclude all statements by the defendant captured on a wiretap must be disclosed to the defense whether they are inculpatory, exculpatory or neither.

■ The People's argument section 629.70 should control over section 1054.1 is not without support. A long-standing principle of statutory construction holds a special statute governs over a general statute even if the general statute is enacted later.[136] Under this principle the specific disclosure provision of the wiretap statute would prevail over the more general disclosure provision of the criminal discovery law even though the general provision is the more recent enactment. This later principle does not apply, however, if an intent to the contrary clearly appears from the more recent statute.[137] Furthermore, it is appropriate to harmonize the two statutes if possible in order to give effect to both.[138]

■ The criminal discovery statute itself tells us its provisions are to be interpreted "[t]o promote the ascertainment of truth in trials by requiring timely pretrial discovery."[139] The statute also tell us one of its purposes is "[t]o provide that no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States."[140] Taken together these provisions demonstrate "[t]he purpose of section 1054 et seq. is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain

---

[134] Section 1054.1, subdivision (b).

[135] Section 629.70, subdivision (b). Of course the defendant's exculpatory statements would have to be revealed in any event under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]. (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 377–378 [285 Cal.Rptr. 231, 815 P.2d 304].)

[136] Code of Civil Procedure section 1859; *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 420 [128 Cal.Rptr. 183, 546 P.2d 687].

[137] *Warne v. Harkness* (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377].

[138] Compare *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 563 [117 Cal.Rptr.2d 168, 41 P.3d 3].

[139] Section 1054, subdivision (a).

[140] Section 1054, subdivision (e).

information in order to prepare their cases and reduce the chance of surprise at trial."[141]

In keeping with the purpose of the general criminal discovery scheme we reject an interpretation of section 629.70 which would allow the prosecution to withhold from the defense any statement made by the defendant. Such an interpretation would be inconsistent with the view of the citizens of California, as expressed in Proposition 115, more opportunities for discovery will lead to more opportunities to ascertain the truth. As we explained above, some statements cannot easily be categorized as inculpatory or exculpatory but may provide defense counsel with information which might lead to the discovery of evidence important to the defense.[142] In *Alderman v. United States*, the Supreme Court explained why it cannot be left up to the government to decide for the defense what is relevant and what is not. "An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances."[143]

We do not believe the proviso in section 1054, subdivision (e) "that no discovery shall occur in criminal cases except as provided in this chapter [or] other express statutory provisions" means the scope of discovery called for in section 629.70, subdivision (b) should supersede the scope of discovery under section 1054.1, subdivision (b). These two sections can be harmonized to give effect to both. Section 629.70, subdivision (b) requires the prosecution to furnish the defense with copies of all recorded interceptions which resulted in inculpatory evidence against the defendant but it does not specifically *limit* the right to discovery to interceptions which led to inculpatory evidence. In construing the reference in section 1054 to "other express statutory provisions" courts have held with respect to the substantive right to criminal discovery an item is discoverable if discovery is authorized *either* under section 1054 or some other statutory provision.[144] On the other hand, the

---

[141] *People v. Jackson* (1993) 15 Cal.App.4th 1197, 1201 [19 Cal.Rptr.2d 80].

[142] See *Joe Z. v. Superior Court, supra,* 3 Cal.3d at page 803.

[143] *Alderman v. United States* (1969) 394 U.S. 165, 182 [22 L.Ed.2d 176, 89 S.Ct. 961].

[144] See, for example, *People v. Superior Court (Barrett), supra,* 80 Cal.App.4th at page 1313 (discovery of reports of witness interviews conducted by Department of Corrections); *People v. Superior Court (Mouchaourab)* (2000) 78 Cal.App.4th 403, 427–428 [92 Cal.Rptr.2d 829] (discovery of certain nontestimonial portions of grand jury proceedings).

procedural mechanisms for discovery contained in other statutory provisions supersede the procedural mechanisms for discovery under section 1054 et seq.[145]

Finally, a statutory interpretation which would make the discoverability of a defendant's statements depend on the manner in which the statement was obtained would raise serious due process problems. Under what rationale should a defendant's statement be discoverable if it is electronically recorded in the course of the defendant's interrogation at the police station but not discoverable if it is intercepted by a wiretap on the defendant's telephone? The People have not suggested a reasonable basis for such a distinction and we cannot conceive of one.

Although the prosecution should have disclosed all of Jackson's conversations intercepted by wiretap the error was harmless. Jackson does not contend the undisclosed conversations were inculpatory, exculpatory or that if they had been timely disclosed they would have led to the discovery of other evidence of importance to the defense.[146]

V.–XVII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

As to defendant Kaseen Jackson the judgment is modified to strike the gun enhancement on count IV. The judgment is affirmed in all other respects.

As to defendant Jant Price the judgment is affirmed.

Upon remand the clerk of the superior court shall prepare and deliver to the Department of Corrections an amended abstract of judgment as to defendant Kaseen Jackson striking the gun enhancement as to count IV. The

---

[145] *People v. Superior Court (Barrett), supra,* 80 Cal.App.4th at page 1313; *Albritton v. Superior Court* (1990) 225 Cal.App. 3d 961, 963 [275 Cal.Rptr. 314] ("Proposition 115 does not abrogate or repeal" the statutory procedures for a *Pitchess* motion, Evidence Code sections 1043–1047).

[146] Compare *People v. Jackson, supra,* 15 Cal.App.4th at page 1202.

*See footnote, *ante,* page 129.

clerk shall prepare and deliver to the Department of Corrections an amended abstract of judgment as to defendant Jant Price showing on count III a sentence of 28 months for the attempted murder and four months for the gun enhancement.

Woods, J., and Zelon, J., concurred.

A petition for a rehearing was denied June 7, 2005, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 17, 2005. Werdegar, J., did not participate therein.