Filed 3/23/23  P. v. Strong CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B322689 / F079628 |
| Plaintiff and Respondent, | (Kern County Super. Ct. No. BF169555A) |
| v. | |
| DANTE J. STRONG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kern County, Kenneth C. Twisselman, II, Judge.  Affirmed and remanded.

James S. Thomson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Jennifer Oleksa, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Dante Strong appeals from a judgment of conviction for involuntary manslaughter of Raymond Martinez and attempted voluntary manslaughter of Richard Martinez.[1] Defendant argues multiple evidentiary, instructional, and sentencing errors require reversal of the judgment. We remand for resentencing pursuant to recent statutory amendments that govern sentencing of youthful defendants. We otherwise affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 26, 2017, defendant and his girlfriend, Blu Tuch, were celebrating her birthday in the city of Mojave. That evening, Tuch posted on Instagram, "Who's got white girl and weed for sale?"[2] The post was visible to any of her followers.

Approximately one hour later, Raymond responded to Tuch's post via direct message and told her he "got the tree," meaning he had marijuana for sale. Over the course of the night and into the next day, Tuch and Raymond worked out the logistics of the transaction through a series of Instagram messages. After Tuch suggested she would "throw a little more money in for gas," Raymond agreed to drive to Mojave to meet with Tuch and her boyfriend at the Fastrip Gas Station and convenience store parking lot. Raymond agreed to sell them a quarter pound of marijuana for $700. Tuch sent Raymond a

---

[1]    To avoid confusion, we refer to the Martinez family members by their first names. We intend no disrespect.

[2]    White girl is the street name for cocaine.

video of a large amount of cash to show she had the funds while Raymond sent Tuch a video of a bag of marijuana.

### 1. *The Shooting*

On August 27, 2017, Raymond drove to Mojave from Lancaster and arrived at approximately 7:30 p.m. His father Richard and his friend Jeremiah Flowers went with him. Richard was extremely intoxicated and slept in the back seat during the drive.

Raymond notified Tuch when they arrived at the Fastrip parking lot. When Tuch and defendant approached Raymond's car, Flowers, who had been sitting in the passenger seat, moved to the backseat with Richard. The events occurring outside the car were largely captured by surveillance video maintained by the businesses in the area. The events within the car were disputed.

According to Flowers, defendant got into the passenger seat of Raymond's car and introduced himself. He then asked to see the product and Raymond complied. Almost immediately, defendant brandished a gun in his right hand. Flowers did not see defendant pull out any money. Richard "jumped up across" from the back seat and struggled for the gun, which discharged. Flowers could not tell who, if anyone, had been hit. Richard testified he woke up suddenly when he heard someone say, "give me that shit" and saw a gun pointed at Raymond. He could not otherwise recall details of what happened after he struggled with defendant over the gun, including his pursuit of defendant outside of the car.

According to defendant, he did not immediately brandish the gun. He instead brought out money, intending to negotiate a lower price for the marijuana. Raymond grabbed the money from

3

his hand while Richard attacked him from the backseat. Defendant pulled his gun out only to protect himself and he fought with Richard for it. The gun discharged during the struggle.

Defendant took Raymond's key from the ignition and ran from the car. Richard pursued defendant, and Raymond followed. Flowers, in shock, stayed in or near the car for "[a] minute or two." He heard two more gunshots and then Raymond staggered back. Raymond told Flowers to call the police because he had been shot. Flowers could see Raymond was bleeding from his throat. Although Flowers attempted to help him, Raymond died at the Fastrip parking lot. Raymond had a gunshot entrance wound on the front of his neck, but no exit wound. A bullet was recovered from his upper right back area during the autopsy.

Richard, in the meantime, continued to pursue defendant. Defendant attempted to drive away in his Honda but it stalled, allowing Richard time to break the passenger window. He then began to punch Tuch, who was sitting in the passenger seat. Defendant got out of the driver's side of the car and shot Richard to protect Tuch. Defendant and Tuch ran across the street. Once Richard stopped his pursuit, defendant ran back to his car and picked up Tuch. Flowers saw defendant and Tuch leave in a black Honda.

Richard made his way back to Raymond's car, where Flowers was trying to help Raymond. Richard was later taken to the hospital, where he remained for two weeks. He suffered one gunshot wound to his face, an entry wound on his chest, and a bullet lodged in his back; his mouth was wired closed and his lips were glued shut; he had to be intubated to be able to eat and breathe; and his lungs had to be drained. At trial, Richard

4

identified defendant as the person who shot him but did not remember many details of the incident, explaining he had been intoxicated. He testified he woke up in the hospital to learn that his son was dead.

Defendant and Tuch were apprehended nearby by three Kern County sheriff's deputies. The deputies received a description over the radio of a dark colored Honda, a black male with dreadlocks, and a white female. Almost immediately, the deputies saw a vehicle with passengers matching those descriptions and turned on their lights and sirens. Defendant, who was driving, attempted to elude the police. He ultimately came to a stop on the grassy area of a mortuary, when he became stuck on top of a cinderblock wall.

The deputies found a silver .38-caliber semiautomatic handgun approximately five or six feet from the passenger side of defendant's car. They also recovered two sets of keys from defendant's car. Defendant admitted at trial the gun was his and he threw it out of the car window because he did not want to be caught in possession of it and possibly be shot by the police as a result. The police recovered a .38-caliber unfired round, and two .38-caliber shell casings at the Fastrip parking lot. The police did not recover any money at the scene nor in Raymond's or defendant's car. They recovered two bags of marijuana in Raymond's car.

## 2.    *The Police Investigation*

In an interview the following morning, defendant initially denied the gun was his. He stated he and Tuch met the seller in a parking lot and when he took out the money to make the purchase, someone "pulled a gun to [his] head." The remainder of his statement tracked his testimony at trial.

5

When the detectives challenged his account, stating the incident was captured on surveillance video and that Tuch had provided a different story, defendant admitted he had bought the gun the previous month. He claimed he brandished it only after Raymond grabbed his money and Richard grabbed his neck from the back.

On August 31, 2017, four days after the shooting, officers obtained a warrant for the records from Tuch's Instagram accounts. They received her digital records from Facebook which included the Instagram messages between Tuch and Raymond regarding the proposed transaction.[3] The records from Facebook also contained a video Tuch posted on August 26, 2017, of defendant holding a beer in one hand and hitting himself in the head with a gun in his other hand while reciting lyrics from a song called "Let Someone Try Me." At trial, defendant admitted he owned the gun in the video and indicated it was the same one he brought to the drug transaction. Another video showed Tuch with a handgun. That video was also played for the jury.

### 3.    *The Trial*[4]

An information charged defendant with first degree murder of Raymond (count 1; Pen. Code, § 187, subd. (a)), attempted first degree murder of Richard (count 2; §§ 187, subd. (a), 664), and

---

[3]    Facebook owns Instagram.

[4]    The People moved to sever Tuch's and defendant's trials on the ground their statements were subject to the rules specified in *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123. The two were prosecuted separately. Tuch's trial was to follow defendant's, but the record does not disclose how the charges against her were resolved.

attempted robbery (count 3; §§ 212.5, subd. (c), 664).[5]  It was alleged as to count 1 that the murder was committed during the commission of a robbery (§ 190.2, subd. (a)(17)), and as to all counts that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

The prosecution's theory at trial was that defendant did not bring any money to the drug deal and that he intended to rob Raymond.  The prosecution presented evidence that defendant lacked funds to buy the amount of marijuana that Tuch had requested from Raymond because he was unemployed.  The prosecution sought a conviction either under a theory of premeditation and deliberation or under the felony-murder rule with robbery as the predicate offense.

Defendant testified at trial that it was Raymond who sought to rob him.  His testimony at trial generally tracked his confession to the police:  Raymond grabbed the money from his hand; Richard grabbed him from behind; defendant pulled the gun from his pocket to protect himself; and it discharged during the struggle.  Defendant then got out of the car, took Raymond's keys to prevent them from following him, and ran to his own car.  Richard followed him, punched out the passenger side window, and began to hit Tuch.  Defendant fired two shots at him to protect her.

Defendant refuted the prosecution's theory that he lacked the funds to buy the marijuana.  Defendant testified he sold drugs, primarily Xanax, marijuana, and cocaine, to make money.  He testified he was unable to supply Tuch with the drugs she

---

[5]     All further undesignated statutory references are to the Penal Code.

wanted for her birthday because his supply was running low and his regular dealer was out of town. Defendant also testified he made money by working for an automotive detailing company and was "paid under the table" for his work there. Defendant lived with his older brother, who testified he allowed defendant and Tuch to live with him rent free. The older brother also frequently checked to see if defendant needed anything, including money. Defendant testified a friend had contributed $150 for the marijuana purchase and defendant's brother had given him $100 the previous day. The rest of the money that he brought, approximately $300, was his own. (The "deal" was for $700 but defendant only brought $550.) Defendant testified the Fastrip in Mojave was one of the busiest places in the city and he believed it would be "pretty dumb" to attempt a robbery there during daylight hours.

The jury acquitted defendant of the murder, attempted murder, and attempted robbery charges. They found defendant guilty of the lesser-included offense of involuntary manslaughter (§ 192, subd. (b)) in count 1 and the lesser-included offense of attempted voluntary manslaughter (§§ 192, subd. (a), 664) in count 2. The jury further found true the firearm enhancement allegations pursuant to subdivision (a) of section 12022.5, rather than subdivision (d), of section 12022.53 for both counts.

The trial court sentenced defendant to 14 years in state prison, comprised of the low term of two years for the involuntary manslaughter count plus the high term of 10 years for the firearm enhancement under section 12022.5, subdivision (a) and a consecutive sentence of one-third the middle term of three years (one year), enhanced by one year for the attempted voluntary manslaughter count and its attendant firearm enhancement.

8

Defendant filed a timely notice of appeal.

***DISCUSSION***

**1.    *The Trial Court Properly Admitted Blu Tuch's Instagram Records Into Evidence Notwithstanding the Government's Failure to Strictly Comply with the Electronic Communications Privacy Act***

Defendant contends the trial court erred when it admitted Blu Tuch's Instagram records into evidence because the People violated the Electronic Communications Privacy Act (ECPA; § 1546, et al.) by failing to strictly comply with its notice requirements.  The People counter that defendant lacked standing to raise a violation of the ECPA, and even if he had standing, there was no error because the violations were merely technical.  We begin our discussion with an overview of the relevant provisions of the ECPA.

**a.    The ECPA**

Among other things, the ECPA restricts the State's ability to "[c]ompel the production of or access to electronic communication information from a service provider."[6] (§ 1546.1,

---

[6]    " 'Electronic communication information' means any information about an electronic communication or the use of an electronic communication service, including, but not limited to, the contents, sender, recipients, format, or location of the sender or recipients at any point during the communication, the time or date the communication was created, sent, or received, or any information pertaining to any individual or device participating in the communication, including, but not limited to, an IP address.  'Electronic communication information' does not include subscriber information as defined in this chapter." (§ 1546, subd. (d).)  The parties do not dispute that Instagram (and

9

subds. (a)(1).)  Such information may be gathered only pursuant to a warrant, wiretap order, subpoena, or other specified means. (§ 1546.1, subd. (b).)

"Except as otherwise provided in this section, any government entity that executes a warrant, or obtains electronic information in an emergency pursuant to Section 1546.1, shall serve upon, or deliver to by registered or first-class mail, electronic mail, or other means reasonably calculated to be effective, the identified targets of the warrant or emergency access, a notice that informs the recipient that information about the recipient has been compelled or obtained, and states with reasonable specificity the nature of the government investigation under which the information is sought.  The notice shall include a copy of the warrant or a written statement setting forth facts giving rise to the emergency.  The notice shall be provided contemporaneously with the execution of a warrant, or, in the case of an emergency, within three court days after obtaining the electronic information."  (§ 1546.2, subd. (a)(1).)

Notice to the identified target under section 1546.2 may be delayed if the government entity submits "a request, supported by a sworn affidavit for an order delaying notification and prohibiting a party providing information from notifying any other party that information has been sought.  The court must issue the order if it determines that there is reason to believe that notification may have an adverse result, but only for the period of time that the court finds there is reason to believe that notification may have an adverse result, and not for more than 90

Facebook, its parent) is an electronic service provider within the meaning of the ECPA.

days."[7] (§ 1546.2, subd. (b)(1).) "The court may grant extensions of the delay of up to 90 days each on the same grounds as provided in paragraph (1)." (§ 1546.2, subd. (b)(2).) "Upon expiration of the period of delay of the notification, the government entity shall serve upon, or deliver to by registered or first-class mail, electronic mail, or other means reasonably calculated to be effective as specified by the court issuing the order authorizing delayed notification, the identified targets of the warrant or emergency access, a document that includes the information described in subdivision (a), a copy of all electronic information obtained or a summary of that information, including, at a minimum, the number and types of records disclosed, the date and time when the earliest and latest records were created, and a statement of the grounds for the court's determination to grant a delay in notifying the individual." (§ 1546.2, subd. (b)(3).)

"Any person in a trial, hearing, or proceeding may move to suppress any electronic information obtained or retained in violation of the Fourth Amendment to the United States Constitution or of this chapter. The motion shall be made, determined, and be subject to review in accordance with the

---

[7]     "An 'adverse result' means any of the following:
(1) Danger to the life or physical safety of an individual.
(2) Flight from prosecution.
(3) Destruction of or tampering with evidence.
(4) Intimidation of potential witnesses.
(5) Serious jeopardy to an investigation or undue delay of a trial." (§ 1546, subd. (a).)

procedures set forth in subdivisions (b) to (q), inclusive, of Section 1538.5."[8]  (§ 1546.4, subd. (a).)

### b.    Proceedings Below

Prior to trial, defendant moved to exclude the electronic records obtained from Tuch's Instagram accounts.  Among his other arguments to the trial court, defendant challenged the sufficiency of the warrant application and delay request under the ECPA.  The People argued that Tuch received timely notice of the search because the fruits of the warrant, if not the warrant itself, were provided to Tuch's attorney.

At the March 4, 2019 evidentiary hearing, Kern County Sheriff's Department Detective Victor Garcia explained Tuch informed him shortly after the shooting that her Instagram "vanity names" or Instagram handles were Blujazminn (with two n's) and Blujazminnnn (with four n's).  Her Instagram communications with Raymond were conducted through the Blujazminn account.  On August 31, 2017, Garcia obtained a warrant for all messages, photographs, videos, and other information regarding those two Instagram accounts for the period between May 1, 2017 and August 31, 2017.

Detective Garcia explained he requested and received one 90-day delay order under section 1546.2, subdivision (b), which allowed the People to delay notifying Tuch of the search until November 29, 2017.  On November 2, 2017, approximately one

---

[8]    Section 1538.5 establishes a single method for the suppression of evidence and the return of property in particular proceedings and at particular stages of the proceedings.  "The purpose of the legislation is to permit the issue to be raised at an early stage, and to require the defendant to raise it at that stage." (13 Witkin, Cal. Crim. Law (4th ed. 2022) Illegal Evidence § 443.)

12

month before the 90-day period expired, the District Attorney's Office provided Tuch's attorney (but not defendant's attorney) with two compact discs containing all the electronic records that had been taken from Tuch's Instagram accounts, including 17 pages of private messages between Tuch and Raymond from the Blujazminn account. The People did not include a copy of the warrant or the 90-day delay order in the discovery disclosure.[9] It was undisputed that Tuch did not receive a copy of the warrant until February 2019, approximately 18 months after the warrant was issued.[10]

Detective Garcia testified he downloaded the information from Facebook, wrote a report, and provided the information to the District Attorney's Office. Garcia believed the ECPA notice requirements were fulfilled by the District Attorney's disclosure to Tuch's attorney.

Defendant argued that, even though the prosecution had provided Tuch with the compact discs within the notice period, the People had violated the ECPA because Tuch had not timely received a copy of the warrant or the delay order. After

---

[9] Defendant does not contend he was entitled to notice from the People of the search of Tuch's electronic records. Nevertheless, defendant received notice of the warrant before Tuch did. On December 12, 2018, defendant's attorney requested a copy of the warrant and the prosecutor sent it to him on December 14, 2018. Tuch received a copy of the warrant approximately two months later.

[10] The prosecutor affirmed at defendant's hearing that Tuch was scheduled to appear the next day for trial setting and that in her separate proceeding, she had not yet brought a motion to suppress her Instagram records.

considering arguments from both attorneys, the trial court denied defendant's motion to quash, finding "there was notice given to Ms. Tuch's attorney within the time allowed by the 90-day delay. And it was reasonably calculated to be effective on putting her, through her attorney, on notice that information about her had been obtained. Because the CDs are right there, showing her that this information had been obtained. And the reasonable specificity concerning the nature of the government investigation would be the [criminal] charges in the case that her attorney was representing her on. And she would be reasonably on notice that the government investigation was seeking this information as it relates to these criminal charges against her." The court further found the notice provision was one that was intended to play a central role in the statutory scheme but the purpose of the provision was achieved in spite of this error.

c. **The Trial Court Properly Denied Defendant's Motion to Quash Under the ECPA**

Defendant contends the trial court erred when it denied his motion to quash because the District Attorney failed to comply with the ECPA's notice requirements. It is undisputed the District Attorney did not provide Tuch with a copy of the warrant until February 2019, approximately 18 months after the warrant was executed. Nor did the District Attorney serve her with a copy of the 90-day delay order. Section 1546.2, subdivision (b)(3) required either copies or summaries of those documents to be timely served on Tuch. Defendant asserts these violations of the ECPA notice requirements automatically rendered the resulting electronic information inadmissible and that the disclosure of Tuch's Instagram records as part of the prosecution's discovery

14

obligations to Tuch was insufficient to satisfy the ECPA. We disagree.

The standard of review of a trial court's ruling on a motion to suppress is well established. "A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.) We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. We independently review the application of the law to the facts. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

i.      *The Legislature Rejected Automatic Suppression*

Defendant argues "[t]he history and purpose of the [ECPA] makes clear that a plain violation of the notice requirement should result in suppression." The Legislature decided otherwise. In initial drafts of the legislation, the following language was originally proposed for section 1546.4, subdivision (a): "Except as proof of a violation of this chapter, no evidence obtained or retained in violation of this chapter shall be admissible in a criminal, civil or administrative proceeding or used in an affidavit in an effort to obtain a search warrant or court order." (Sen. Bill No. 178 (2015-2016 Reg. Sess.) (Feb. 9, 2015) sec. 1546.4 on p. 7.) This language was stricken in the August 17, 2015 draft and replaced by the current language in the statute authorizing "any person" to file a motion to suppress. (Sen. Bill No. 178 (August 17, 2015) sec. 1546.4, p. 8.) The Legislature thus declined to create automatic suppression as a remedy for every violation of the ECPA.

15

*ii.    People v. Jackson Is Instructive.*

Given that automatic suppression is not the rule, we now consider how a trial court should evaluate a motion to suppress for a violation of the ECPA.  At the motion to quash hearing below, defense counsel, citing to Judge Caskey's treatise and other secondary authorities discussing the ECPA, urged the trial court to begin its analysis by looking to *People v. Jackson* (2005) 129 Cal.App.4th 129 (*Jackson*).  (Caskey, Expert Series: California Search and Seizure (2016 ed.) § 10:20.)  The People did not rely on *Jackson* but offered no alternative procedure.  On appeal, the parties have reversed their positions — the Attorney General contends *Jackson* is instructive while defendant argues the trial court erred in relying on *Jackson*.  We find the Attorney General's current argument more persuasive.

*Jackson* dealt with the violation of California's wiretap law (§ 629.50 et seq.), which, almost identically to section 1546.4, subdivision (a), states:  "Any person in any trial, hearing, or proceeding, may move to suppress some or all of the contents of any intercepted wire . . . communications, or evidence derived therefrom, only on the basis that the contents or evidence were obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter.  The motion shall be made, determined, and be subject to review in accordance with the procedures set forth in section 1538.5." (*Jackson, supra,* 129 Cal.App.4th at p. 146, fn. 19, quoting § 629.72.)  Like the ECPA, the wiretap statute examined by *Jackson* also had the dual purpose of protecting the privacy of wire and oral communications, and delineating a uniform basis under which the interception of these communications may be authorized. (*Jackson,* at p. 147.)

16

*Jackson* presented three questions for a court to consider when evaluating a motion to suppress evidence for violation of the wiretap statutes:  "(1) Has the defendant established a violation of a provision of the wiretap law?  If not, the motion is denied.  (2) If a wiretap violation has been established was the provision violated one which 'was intended to play a central role in the statutory scheme[?]'  If the provision was not intended to 'play a central role,' failing to comply with it will not render interceptions under the wiretap order unlawful and the motion is denied.  (3) If the provision violated was central to the legislative scheme was the purpose of the provision achieved in spite of the error?  If the purpose was achieved, the motion is denied.  If the purpose was not achieved, the motion is granted.  The analysis of a suppression motion focuses on violations of the statutory procedures and not on constitutional violations, because while it is possible to violate a core principle of the statute without violating the Fourth Amendment it would not seem possible to violate the Fourth Amendment without also violating a core statutory principle."  (*Jackson, supra,* 129 Cal.App.4th at p. 149, fns. omitted].)

We adopt the *Jackson* three-prong inquiry to evaluate motions to suppress under the ECPA.  *Jackson* addresses a similarly worded statute that also focuses on protection of privacy rights in the electronic capture of information and sets out a procedure for the search and seizure of private information under section 1538.5.

Defendant argues *Jackson* does not apply, but suggests that if we look to *Jackson* at all, an affirmative response to the first two questions ends the inquiry.  *Jackson* disagreed with this approach.  It observed, "Cases involving challenges to traditional

searches under section 1538.5 have long applied a 'harmless error' test when considering whether to suppress evidence because of minor violations of statutory procedures. . . . Even violations of core requirements of the search procedure such as the warrant's failure to describe the place to be searched with particularity may not result in suppression of the evidence seized in the search if the People can demonstrate the warrant served the purpose of the requirement:  to prevent a general rummaging around in a person's belongings." (*Jackson, supra,* 129 Cal.App.4th at p. 152, fn. omitted, citing cases].)

  *Jackson* further explained that a rule premised on strict compliance would lead to the suppression of relevant wiretap evidence without advancing a defendant's legitimate privacy interest or the interest of society in curbing abuse of electronic surveillance.  (*Jackson, supra*, 129 Cal.App.4th at p. 148; see also *United States v. Chavez* (1974) 416 U.S. 562, 575 ["suppression is not mandated for every violation" of analogous federal wiretap statute]; cf. *People v. Head* (1994) 30 Cal.App.4th 954 [no suppression for late filing of search warrant return].)  Defendant has provided no persuasive authority or argument to counter *Jackson's* reasoning.

*iii.*  *The Purpose of the Notice Requirements Was Achieved Despite the Noncompliance.*[11]

  Applying *Jackson's* three-step inquiry, we now address whether the trial court properly denied the motion to quash.  The trial court answered *Jackson's* first two questions in the

---

[11]  In reaching our conclusion, we need not, and do not, address the People's threshold argument that defendant lacks standing to move to quash the admission of Tuch's Instagram records in his trial.

18

affirmative and neither party disputes those determinations. We therefore limit our discussion to the third question — whether the purpose of the notice requirements was achieved in spite of the error.

By its express language, section 1546.2, subdivision (b)(3), aims to provide the target of the warrant with prompt notice of (1) what information has been compelled or obtained, (2) the nature of the government investigation under which the information is sought, and (3) a statement of the grounds for the court's determination to grant any delay in notifying the target. (See also Legis. Counsel's Dig., Sen. Bill No. 178, Stats. 2015 (2015-2016 Reg. Sess.).) The ECPA achieves these purposes by providing the target with a copy of the warrant, a copy of the electronic information obtained from the warrant, and a copy of the delay order, or summaries of such information.

Under the facts of this case, the District Attorney timely provided Tuch with information about what had been sought (her Instagram account records for Blujazminn and Blujazminnnn over multiple months in 2017) or obtained (the communications between her and Raymond and videos including those showing her and defendant with a firearm,), and the nature of the investigation (criminal proceedings).[12] This information was served on Tuch's attorney by way of the discovery disclosures on

---

[12] Defendant argues disclosure of only the fruits of the warrant would not promptly notify Tuch of the nature and scope of the warrant to allow her to challenge any overreach before production of the electronic information. We disagree. Section 1546.2, subdivision (b)(3) expressly allows for delayed notice so that a challenge to the warrant may only arise after the information itself has been obtained by the government

19

November 2, 2017, at least three weeks before the expiration of the 90-day delay order and years before Tuch's trial, allowing Tuch to make a timely and informed decision whether to file a motion to suppress.[13]

Although Tuch was never served with a copy of the delay order, Tuch was not prevented from making a timely and informed decision about moving to suppress the seized evidence. Under the statute, Tuch would not have known about the delay order or the reasons in support of a delay until after the 90-day extension had expired. At that point, she had already received all the electronic information obtained under the warrant, allowing her to decide whether to seek exclusion of any particular record or piece of information. (§ 1538.5, subd. (a)(2) [requiring a list of "the specific items of property or evidence sought to be returned or suppressed"].) Defendant makes no effort to explain how the failure to provide Tuch with a copy of the delay order subverts the purpose of the notice requirements.

Defendant instead suggests the notice requirements would incentivize the State to follow the law and increase consumer trust in data privacy. This point does not advance our inquiry. Obviously, any statutory mandate is to be followed. When the

---

[13] A section 1538.5 motion to suppress may be made before trial. It may also be made during trial if the defendant was not aware of the grounds for the motion before trial. (§ 1538.5, subd. (h); Levenson & Ricciardulli, Cal. Criminal Procedure (The Rutter Group Dec. 2022) § 6:7.) The record does not disclose when or if Tuch's trial was held. There is no dispute that Tuch's trial was to begin after defendant's 2019 trial and she received the discovery disclosures in 2017, two years before the trial of either defendant or Tuch was to start.

prosecution does not comply with a key statutory provision, we then consider whether the purpose of the provision was achieved nonetheless. Here, we conclude it was.[14]

## 2. *Tuch's Electronic Data Was Not Inadmissible Testimonial Hearsay*

Defendant next contends the electronic data obtained from the warrant, specifically the data denoting the author, date, and time of Tuch's Instagram posts and messages, constituted inadmissible testimonial hearsay. Our Supreme Court essentially rejected this argument in *People v. Goldsmith* (2014) 59 Cal.4th 258. In *Goldsmith,* the defendant received a traffic ticket for running a red light based on photographs and video generated by a red light traffic camera. The camera was operated by a computer, which imprinted on all the photographs the date, time, location, and how long the light had been red at the time of the photograph. (*Id.* at p. 264.) The Supreme Court explained that information automatically generated by a computer is not a statement of a person as defined by the Evidence Code and therefore, does not constitute hearsay. Nor is that type of testimonial statement that is subject to the confrontation clause. (*Goldsmith.* at pp. 274-275; *People v. Lopez* (2012) 55 Cal.4th 569, 583 [use of computer printouts at trial did not violate a defendant's right to confront and cross-examine the machine's operator even where the printout contains no statement from the operator attesting to the validity of the data shown].)

---

[14] Defendant does not purport to explain how automatic suppression of this type of evidence, without a harmless error inquiry, increases consumer trust in data privacy.

21

Here, Detective Garcia testified to the procedure by which he submitted the warrant to Facebook: he logged on to a law enforcement portal maintained by Facebook, he authenticated his identity by using his Sheriff's Department e-mail address, he submitted the required information, and he attached a copy of the warrant to his request. Facebook sent an e-mail with a link to Tuch's Instagram records responsive to the warrant. Facebook later provided a certificate of authentication that Tuch's Instagram records were created in the normal course of its duties. Garcia testified Tuch's Instagram records were time- and date-stamped according to the Universal Time Coordinate, which Garcia explained is seven hours ahead of Pacific Standard Time. Like the machine-generated information found in *Goldsmith* and *Lopez,* the author, time, and date data found in Tuch's Instagram records are neither testimonial nor hearsay.

To the extent defendant is arguing that there was insufficient foundation for the admission of the Instagram posts, defendant himself provided much of the foundation: Defendant told the detectives Tuch arranged the meeting through her Instagram account and Raymond sent pictures of the marijuana to them. They finalized the location and time of the meeting approximately an hour before they met at the Fastrip parking lot. At trial, defendant confirmed Tuch arranged for the meeting over Instagram. He testified as to the date and approximate times of the relevant Instagram posts. Defendant testified he knew that Tuch asked to buy marijuana and cocaine in an Instagram post. He recalled seeing the Instagram messages between Tuch and Raymond on August 27, 2017. He affirmed that the video of him holding a beer and a gun was taken "later in the night" of

August 26, 2017, or "early in the morning" of August 27, 2017. He also admitted he owned the gun in the video.

### 3. *The Admission of the Entire Video of Flowers's Police Interview Was Harmless Error*

Defendant next contends the trial court abused its discretion when it admitted the entirety of the video-recorded police interview of witness Flowers (the third person in the Martinez vehicle) because some parts of the interview were inadmissible prior consistent statements of a witness pursuant to Evidence Code section 791.[15]

At trial, defense counsel sought to impeach Flowers with statements he made to the police that were inconsistent with his trial testimony. In particular, Flowers denied he knew anything about a drug deal or that Raymond asked him to act as "backup." This trial testimony directly contradicted his statements to police that he knew Raymond had set up a drug deal with a woman on Instagram and Flowers went along "to back him up or whatever. . . ." On redirect, the trial court allowed the prosecutor to play the entirety of Flowers's statement to police over the defense's objection.

Defendant's argument is Flowers's prior inconsistent statements, which he concedes are admissible, were all made in

---

[15] Evidence Code section 791, subdivision (a) provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement[.]"

the first half of his interview with the police, that is, the first 10 pages of the 21-page transcript. Flowers's remaining statements in pages 11 through 21, were consistent with his trial testimony and were made *after* the inconsistent statements in pages 1 through 10. Thus, they were not admissible under Evidence Code section 791, which allows prior consistent statements to be admitted into evidence only if they occur *before* any inconsistent statements. As a result, the court erred when it admitted the second half of the 20-minute video, allowing the prosecution to rehabilitate Flowers's credibility.

Assuming it was error to admit the second half of the interview, it is not reasonably probable under *People v. Watson, supra,* 46 Cal.2d at page 836, that defendant would have received a more favorable result had the prior consistent statements been excluded. (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1317.)

From its acquittal of defendant of the robbery charge, it is apparent the jury did not find Flowers entirely credible. Defendant acknowledges that "[a]part from [defendant], Mr. Flowers was the only witness able to describe the events inside Raymond's car leading up to the shooting" because Raymond was dead and Richard was very intoxicated. In short, the trial pitted Flowers's account of the incident inside the car — that defendant pulled out a gun and not money — against defendant's — that he initially pulled out money, not a gun. Defendant acknowledges that by acquitting him of the attempted robbery count, "the jury ultimately rejected the prosecution's theory that [defendant] had tried to rob Raymond, Richard, and Mr. Flowers . . . ."

We are not persuaded by defendant's assertion that it is reasonably probable the jury would have fully credited defendant's version of events if not for the admission of Flowers's

24

prior consistent statements. Defendant testified he brought insufficient funds and a gun to a drug deal, and that he intended to re-negotiate the deal. He also testified Raymond was shot during the struggle over the gun. From these facts, it is not reasonably likely the jury would have acquitted defendant of Raymond's death.

### 4. *Neither Defendant's* Miranda *Waiver Nor His Statement to Police Were Involuntary*

Defendant next argues his waiver under *Miranda v. Arizona* (1966) 384 U.S. 436 and subsequent statements to the police were involuntary due to his youth, sleep deprivation, isolation, and intoxication. According to defendant, the trial court erred in admitting his post-arrest statements. The record supports the trial court's contrary conclusion.

#### a. Proceedings Below

Defendant was arrested at 8:00 p.m. on August 27, 2017. He was interviewed by detectives at approximately 3:00 or 4:00 a.m. the following morning.[16] Detective Garcia advised defendant of his *Miranda* rights by reading from a preprinted card. Defendant affirmed that he understood each *Miranda* warning read to him but asked at the end of them, "Would I need an attorney or?" Garcia responded, "That's entirely up to you, man. I can't tell you." After this exchange and without any further discussion or questions, defendant began to tell the detectives his version of events as we have described above.

Prior to trial, defendant moved to suppress his post-arrest statements. At an evidentiary hearing, Garcia testified

---

[16] The interview was video-recorded and the recording and transcript were admitted into evidence and shown to the jury.

25

defendant "appeared to be resting" when he first entered the interview room but defendant "did not appear to be impaired." Garcia did not understand defendant's question "would I need an attorney or" to mean he was in fact requesting one.[17]

Defendant testified at the hearing that he had just turned 20 at the time of the interview. On the day of his arrest, he drank five or six Modelo beers, smoked five or six cigarillos of marijuana throughout the day, and took one Xanax. His last meal before his arrest was lunch at noon. He testified the room was cold and he was tired so he dozed on and off while he waited approximately six hours to be interviewed.

Defendant acknowledged he responded, "yes, sir" when asked whether he understood each of the *Miranda* advisements, but equivocated, "I never been through that before. So I understood to a certain extent." Defendant attested that the detectives neither threatened him nor offered him leniency. Although he "wasn't all the way there," he was not "totally disoriented."

The trial court and counsel engaged in a lengthy discussion of the circumstances surrounding defendant's interview, and the trial court watched the video of his interview. The court found the People proved the voluntariness of the statements and any admissions or confessions made by defendant by a preponderance of the evidence. The court concluded there was nothing deceptive or misleading about Detective Garcia's response to defendant's question "Would I need an attorney or?" The court also found defendant was able to sleep despite the temperature in the room

---

[17]     Defendant does not contend his statements were involuntary because they were made after he had invoked his right to counsel under *Miranda.*

26

and thus he was not sleep deprived.  As to his intoxication, the court found it significant that considerable time had elapsed, which would have allowed him to regain sobriety.  Nor did the court find defendant's age to be a factor that would cause his statement to be involuntary.

### b.    Analysis

We conclude, after reviewing the record and the video of the interview in particular, that defendant understood and knowingly and voluntarily waived his *Miranda* rights, and voluntarily made the statements to the detectives.

Our Supreme Court recently explained review of a *Miranda* challenge this way:  " 'To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of custodial interrogation, the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation.'  A suspect who has heard and understood these rights may waive them.  '[T]he prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation.'  This analysis requires an evaluation of both the defendant's state of mind and circumstances surrounding the questioning.  On appeal, we accept the trial court's factual findings and credibility assessments if supported by substantial evidence.  " ' " ' "We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." ' " '  Where, as was the case here, an interview is recorded, the facts surrounding the

admission or confession are undisputed and we may apply independent review." (*People v. Leon* (2020) 8 Cal.5th 831, 842–843, citations omitted (*Leon*).)

Likewise, "[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) " 'A confession is involuntary under the federal and state guaranties of due process when it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. [Citation.] Coercive police activity is a necessary predicate to a finding that a confession was involuntary under both the federal and state Constitutions." (*People v. Delgado* (2018) 27 Cal.App.5th 1092, 1107.) As with *Miranda* waivers, the People bear the burden of establishing by a preponderance of the evidence the voluntariness of a confession. (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

Here, the following is shown by the video recording of defendant's interrogation: Defendant responded, "yes, sir" to each of Detective Garcia's *Miranda* advisements. He did not appear disoriented or unable to understand the questions or advisements given to him. To the contrary, defendant gave cogent and coherent responses to the questions posed. The detectives appeared calm throughout the interview and did not attempt to threaten or coerce defendant. We conclude from our independent review of the video recording that the People proved by a preponderance of the evidence that defendant's waiver of his *Miranda* rights and his subsequent confession were freely and voluntarily given.

Aside from the video evidence, substantial evidence supports this conclusion. Detective Garcia testified defendant did not appear disoriented and defendant admitted he was not "totally disoriented." He also confirmed the detectives neither threatened him nor offered him leniency. Defendant does not argue he was misled by Garcia's response to his question regarding needing an attorney.

Although defendant contends his *Miranda* waiver and subsequent statements to the police were involuntary due to his age, intoxication, sleep deprivation, and isolation, substantial evidence supported the trial court's contrary findings. At the time of the interview, defendant was 20 years old, not a minor. That the interview took place eight hours after his arrest supported the trial court's finding that defendant was not affected by the five or six beers, the five or six cigarillos of marijuana, and the one Xanax tablet he had taken throughout the previous day. Defendant also conceded he was able to sleep on and off while he waited in the interview room, despite the cold and the isolation. "Moreover, defendant's attempt to deceive the officers in his initial interview indicates attentiveness and an awareness of his circumstances." (*Leon, supra,* 8 Cal.5th at p. 844.)

Defendant's demeanor and attempt to deceive the detectives is at odds with his argument on appeal that he was intoxicated, sleep deprived, isolated, and too young to voluntarily waive his rights or confess to his crime. Under these circumstances, there is sufficient evidence that defendant's *Miranda* waiver was knowing, intelligent, and voluntary. For the same reasons, we reject defendant's argument that his

29

subsequent confession was involuntary or coerced. (*People v. Jones* (1998) 17 Cal.4th 279, 296.)

### 5. *The Trial Court Properly Instructed the Jury on Self-defense*

Defendant contends the trial court erred in failing to instruct the jury that CALCRIM No. 3470 applies to brandishing a weapon as a component of the involuntary manslaughter charge. The prosecution proceeded on the theory that defendant's involuntary manslaughter of Raymond arose from his act of brandishing a firearm with criminal negligence.[18] The court instructed the jury with CALCRIM No. 3470, describing self-defense in non-homicide crimes, and advised the jury that the instruction applied only to the attempted murder and attempted *voluntary* manslaughter charges. Defendant argues the court erred in not also informing the jury CALCRIM No. 3470 applied to the underlying offense of brandishing a weapon as part of the *involuntary* manslaughter charge.

As a threshold matter, defendant has forfeited this argument for failure to request clarification or a pinpoint instruction on this defense. (*People v. Lee* (2011) 51 Cal.4th 620, 638; see *People v. Webster* (1991) 54 Cal.3d 411, 443.) Even if the issue were not forfeited, we find no error.[19] First, CALCRIM

---

[18] The elements for involuntary manslaughter are: (1) the defendant committed an underlying crime, in this case, brandishing a firearm; (2) the defendant committed the underlying crime with criminal negligence; and (3) the defendant's acts caused the death of another person. (CALCRIM No. 580.)

[19] Given our conclusion that no error occurred, we need not address defendant's ineffective assistance of counsel argument.

30

No. 3470 must be given when a defendant is charged with the crime of brandishing a weapon. (See Bench Notes to CALCRIM No. 983 [Brandishing Firearm or Deadly Weapon: Misdemeanor (Pen. Code, § 417(a)(1) & (2))].) Defendant was not charged with that crime and therefore the trial court was not required to instruct the jury on CALCRIM No. 3470. Second, CALCRIM No. 983, which was given to the jury and describes the crime of brandishing a firearm, provides that the People must prove, among other things, that the defendant did not act in self-defense when he brandished the firearm. This instruction is sufficient to apprise the jury that self-defense is available to defend against the allegation of brandishing a firearm as part of an involuntary manslaughter charge.

## 6. *Cumulative Error*

Defendant contends that cumulative error requires reversal of his conviction. We have assumed (but not found) one error — the admission of Flowers's prior consistent statements — and found that error to be harmless. Defendant's cumulative error claim fails.

## 7. *Sentencing Issues*

### a. The Trial Court Properly Imposed the Firearm Enhancement as to Count 1

Defendant argues the trial court erred when it imposed the firearm enhancement under section 12022.5 to his sentence for count 1, involuntary manslaughter. Section 12022.5, subdivision (a) states that "any person who personally uses a firearm in the commission of a felony" shall receive enhanced punishment "unless use of a firearm is an element of that offense." Defendant argues his involuntary manslaughter conviction was based on his

31

brandishing of a firearm and thus, personal use of a firearm was an element of his involuntary manslaughter conviction.

As defendant acknowledges, this argument has been rejected by *People v. Read* (1983) 142 Cal.App.3d 900 (*Read*). The *Read* court held, "Firearm use is not an element of the felony of involuntary manslaughter; just as murder, this crime can be committed in a variety of ways without using a firearm." (*Id.* at p. 906; accord *People v. Quesada* (1980) 113 Cal.App.3d 533, 540 (*Quesada*) ["The crime of manslaughter may be committed in many ways without a firearm; the fact that this particular crime was committed with use of a firearm does not make such use an 'essential element' of the offense"].)

Here, defendant brandished a firearm in committing involuntary manslaughter, a felony. (§§ 417, subd. (a)(2), 192, subd. (b).) As discussed in *Read* and *Quesada,* the felony of involuntary manslaughter may be committed without the use of a firearm. As such, we agree with these cases that the use of a firearm is not an element of involuntary manslaughter. Defendant's sentence did not implicate dual use of a firearm, and the enhancement was properly imposed as to count 1.

We reject defendant's attempt to distinguish *Read* on the ground that the current version of section 417 states two separate offenses: one for brandishing "any deadly weapon whatsoever, other than a firearm" under subdivision (a) and one for brandishing a firearm under subdivision (b). This amendment to section 417 makes no difference to the holdings in *Read* and *Quesada* that involuntary manslaughter can be committed in many ways, with or without a firearm, and use of a firearm is not an element of the offense.

### b. We Remand for Resentencing

By supplemental brief, the parties advised this court of recent amendments to section 1170, subdivision (b) by Assembly Bill No. 124 and Senate Bill No. 567.[20] Effective January 1, 2022, section 1170, subdivision (b)(6), now provides:

> "Notwithstanding paragraph (1) [directing that the court impose a sentence not to exceed the middle term of a sentencing triad except as provided in subdivision (b)(2)], and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:

> "(A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.

> "(B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.

---

[20] Three bills amending section 1170 — Senate Bill No. 567, Assembly Bill No. 124, and Assembly Bill No. 1540 (2021-2022 Reg. Sess.) – were enacted and signed into law on the same date. (Stats. 2021, ch. 731, § 1.3 , eff. Jan. 1, 2022; Stats. 2021, ch. 695, § 5 , eff. Jan. 1, 2022; Stats. 2021, ch. 719, § 2 , eff. Jan. 1, 2022.) Senate Bill No. 567 incorporated the amendments proposed by Assembly Bill Nos. 124 and 1540, and provided that if all three bills amending section 1170 were enacted and became effective on or before January 1, 2022, and Senate Bill No. 567 were enacted last, then section 1.3 of Senate Bill No. 567 would become operative. (Stats. 2021, ch. 731, § 3.)

"(C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking."

Assembly Bill No. 124 also added section 1016.7, subdivision (b), which provides that a " 'youth' " "includes any person under 26 years of age on the date the offense was committed." (Stats 2021, ch. 695, § 4.)

The parties agree the amendments to section 1170 apply retroactively to defendant, who was sentenced to the high term of 10 years under section 12022.5, who was 20 years old at the time the offense was committed, and whose case is not yet final. (*In re Estrada* (1965) 63 Cal.2d 740.)

We agree with the parties that this matter must be remanded for a resentencing hearing consistent with the amendments to section 1170, subdivision (b). On remand, the trial court may revisit all of its prior sentencing decisions. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a [trial] court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["the 'full resentencing rule' "].)

### DISPOSITION

The matter is remanded for resentencing. We otherwise affirm the judgment.


RUBIN, P. J.

WE CONCUR:


BAKER, J.                                    MOOR, J.

34